Thorburn **KENNEDY**, Trustee, et al., Plaintiffs, Appellees,

v.

**JOSEPHTHAL & COMPANY, INC.,** et al., Defendants, Appellees.

Edward M. Swartz and Fredric Swartz, Plaintiffs, Appellants.

No. 85–1833.

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1986.

Decided March 26, 1987.

Alan L. Cantor with whom Swartz & Swartz, Boston, Mass., was on brief for plaintiffs, appellants.

Alan I. Raylesberg with whom Barry Michael Okun, Rosenman Colin Freund Lewis & Cohen, New York City, and Gerald H. Abrams, Newton, Mass., were on brief for defendant, appellee Josephthal & Co., Inc.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and PIERAS,* District Judge.

* Of the District of Puerto Rico, sitting by designation.

1. Appellants also brought a claim pursuant to the Massachusetts Consumer Protection Act, MGL c.93A. The Supreme Judicial Court of

PIERAS, District Judge.

We review here the grant of a summary judgment and other dispositive motions, by the United States District Court for the District of Massachusetts, in favor of defendant, Josephthal & Co. The plaintiffs, Thorburn Kennedy, as Trustee of the Thorburn Kennedy Revocable Trust, Edward Swartz, and Frederic Swartz, originally brought claims against defendant in December 1981, based on the sale of shares of a limited partnership called NRG Coal Associates 1979–II (NRG). The purpose of the partnership was to profit by the mining and selling of coal. Apparently, no coal was mined or sold. Plaintiffs sought damages from their broker, who facilitated the purchase of the limited partnership shares.

The district court held, in various memorandum opinions, that (1) plaintiffs' claim under section 12(2) of the Securities Act of 1933 was time barred; (2) plaintiffs' claims of fraud under section 10(b) of the Securities Exchange Act of 1934, section 410 of the Massachusetts Securities Act, and the common law must be dismissed because, as a matter of law, plaintiffs could not have justifiably relied on the oral representations of the defendant that were at variance with the private offering memorandum elucidating the investment; (3) defendants did not offer an unregistered security in violation of section 301 of the Massachusetts Securities Act; and (4) leave would not be granted to plaintiffs to file a second amended complaint.[1] Plaintiffs Edward and Fredric Swartz appeal each of these rulings. For the reasons set forth, we affirm the district court in all respects.

I.

In late 1979, the appellants invested $20,000.00 in cash and signed promissory notes for $180,000.00 to acquire two-and-one-half units in NRG. Although they had dealt for some time with one Josephthal broker on other financial matters, appellants' transac-

Massachusetts has specifically held that chapter 93A does not apply to securities transactions. *Cabot Corp. v. Baddour,* 394 Mass. 720, 477 N.E.2d 399 (1985). For this reason appellants do not press this claim.

tions on this occasion were through another Josephthal employee, Neal Sinclair. As placement agent for the investment, Josephthal provided appellants with a Confidential Offering Memorandum issued by Josephthal and the general partner of NRG. This memorandum contained information in a form common to other investment prospectuses.

In this offering memorandum and appellants' talks with Sinclair lie the heart of appellants' claims of fraudulent misrepresentation and omission. The Confidential Offering Memorandum is replete with warnings. First, it states that only the general partner of NRG is authorized to give any information concerning the partnership and its proposed operations; that any information not contained in the memorandum nor given by the general partner must not be relied upon. It continues with a warning that the offering involves a high degree of risk. The specific risk factors are also set out, preceded by this legend:

*Risk Factors*

Investment in the partnership involves a high degree of risk. Therefore, it is suitable only for those persons having a continuing high amount of annual income and a substantial net worth who can afford to bear such risks and have no need for liquidity from their investments. Each prospective investor should consider carefully the risk factors attendant to the purchase of units, including, but not limited to, those discussed below, and should consult his own legal, tax and financial advisors with respect thereto.

The numerous and detailed risks cited in the offering memorandum include that such mining operations would be unprofitable at the prevailing price of coal even if the operation fully developed the field; that there was no assurance that the coal was economically recoverable; that the partnership expected to cease operation if coal could not be mined profitably; that similar ventures had been unprofitable because of the prevailing price of coal; that investors could be liable for additional working capital or payment of principal and interest on debt if NRG were unable to maintain operations; that the mining con-

tractor had no employees, no assets, and no operating history; that there were no short- or long-term commitments by anyone to purchase the coal mined by NRG; and that the general partner of NRG was a general partner of an adjacent and competing coal tract.

The warnings, designed to protect the offeror, revealed that NRG would, in all likelihood, utterly fail as a viable coal mining operation. Appellants nevertheless executed documents stating that they had read the offering memorandum, appreciated the risks involved, and could afford to lose their investment. In putting their money down, appellants claimed to have relied on the following statements made by Sinclair: (1) that contracts for the sale of coal by the partnership were "in the mill" or words to that effect; (2) that the partnership was ready to start producing coal; (3) that this was a "safe investment with a lot of protection" or words to that effect; (4) that the partnership would be profitable even at the then existing price of coal; (5) that defendant Josephthal had fully investigated the proposed venture and determined it to be bona fide; (6) that NRG had an excellent track record and the investors in their limited partnership programs had never experienced a call on their letters of credit; and (7) that defendant Josephthal would monitor the progress of the venture on behalf of the investors.

While not impossible, it somewhat strains credulity for appellants to claim that they made this investment for the purpose of profiting by the mining and selling of coal. Appellants were informed in the offering memorandum that there was no coal operation in place to make a return on their investment. In today's investment world, however, "performance" may not necessarily mean an increase in value due to beating the competition in the normal course of the production of goods and services. Pure speculation in commodities, including the means of producing those commodities, may prove more enticing than the more mundane role of actually owning part of a coal mine. Tax shelters, too, are sometimes more useful to investors

than another real investment. These considerations may have been behind appellants' gamble but we need not consider them.[2] Appellants claim, and we base our decision on the allegation that they wished to purchase an interest in a coal mining operation and that the misrepresentations and omissions of appellee falsely made that investment seem attractive.

The investment apparently now lost, appellants filed suit in the Massachusetts Commonwealth courts on December 28, 1981. The suit was subsequently removed to federal district court, where the complaint was dismissed for the reasons cited *supra.* We review these seriatim.

## II. *Statute of Limitations on Section 12(2) of the Securities Act of 1933*

Appellants contend that appellee's misrepresentations and omissions violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2). Section 13 of the 1933 Act provides a clear statute of limitations for section 12(2): "within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. If appellants are to escape the limitation on this action, they must show that the statute was tolled between the sale of the partnership units in December 1979 and at least December 28, 1980, one year before the suit was filed.

■ Fraudulent concealment tolls the statute of limitations

> where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part ... until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.

*Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1875) (footnote omitted). The statute will be tolled even without affirmative acts on the part of the defendant unless the plaintiff, through reasonable diligence, discovered or should have discovered the fraud. *Cook v. Avien, Inc.,* 573 F.2d 685, 695 (1st Cir.1978). Appellants claim that appellee's fraudulent concealment so tolled the statute, in that appellants could not have discovered the fraud because of appellee's continuing fraudulent misrepresentations and omissions.

■ Appellants need not, however, have fully discovered the nature and extent of the fraud before they were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself. *Sleeper v. Kidder, Peabody & Co.,* 480 F.Supp. 1264, 1267 (D.Mass.1979), *aff'd,* 627 F.2d 1088 (1st Cir.1980); *see also Cook,* 573 F.2d at 696; *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970). This circuit has characterized the facts that trigger inquiry notice as "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale." *Cook,* 573 F.2d at 697.

■ We are faced here with the great glowering clouds of the offering memorandum and the quite different forecast of Sinclair. For example, the offering memorandum, after warning that only the general partner is authorized to give any information concerning the partnership, went on to note that the operation would not be profitable at the prevailing price of coal. Sinclair, not a general partner, apparently announced the opposite. A reasonable investor would have at least enquired as to this glaring difference but instead appellants, according to their own version, relied on the more favorable assessment. A "misleading statement or significant omission," however, is the most logical explanation for the disparity between the written representations of the prospectus and the oral representations of Sinclair. Appellants were, therefore, on inquiry notice from the time they received the prospectus and spoke with Sinclair prior to the December 1979 closing.

**2.** When directly asked at oral argument what purpose lay behind the investment, appellants gave an unresponsive answer.

The notice appellants were on triggered the duty to exercise reasonable diligence. *Cook*, 573 F.2d at 696. The exercise of reasonable diligence is determined by examining "the nature of the misleading statements alleged, the opportunity to discover the misleading nature of the statements, and the subsequent actions of the parties." *Id.* at 696–97.

Appellants allege that the single most misleading statement was the assertion that the partnership intended to mine and sell coal, and that nothing in the difference between the offering memorandum and Sinclair's opposite representations pointed to the possibility that the partnership's intentions were not as they seemed. While this was quintessentially the fraud, this single, concise statement of fraud glosses over the mechanisms of fraud: duping and beguiling the victim through reassurances and dissembling. This was accomplished here not by the bald assertion that the partnership intended to mine and sell coal when it did not, but rather by saying that this was a safe investment, that the partnership was ready to start producing coal, that this venture would be profitable even at the prevailing price of coal. It was these words that fooled, if indeed they did fool, the appellants into putting cash on the barrelhead.

The opportunity to discover the misleading nature of the statements could not have presented itself more readily than it did. For each oral representation that Sinclair made and upon which appellants claim they relied, there was a direct refutation by the plain language of the offering memorandum. Both Sinclair's statements and the offering memorandum's assertions could not be true at the same time. Logically, one statement or the other must have been false. Any attempt to resolve these contradictions should have uncovered the fraud or, at a minimum, dissuaded appellants from this folly. The appellants not only had, but were handed with the offering memorandum, ample opportunity to discover that there were misleading statements or omissions being made.

The subsequent actions of the parties cannot help appellants' case. Instead of resolving the contradictions, the appellants merely chose which sets of statements they wished to believe and acted upon those beliefs. That appellee may have continued to perpetrate the fraud does not negate the fact that it was appellants' conduct, in accepting the fraudulent representations and omissions as true, that allowed the fraud. Normally, the exercise of reasonable diligence would be a question of fact and not amenable to summary disposition. *Cf. Cook*, 573 F.2d at 697 & n. 27 (question of reasonable diligence factually based but gives rise to mixed question of law and fact). Here, however, it can be said that as a matter of law, the exercise of reasonable diligence would require more of appellants than merely viewing two sets of statements, one of which logically cannot be true, and chosing one of those sets. We believe no reasonable fact finder could determine that appellants exercised reasonable diligence. The district court was correct in ruling that appellants did not exercise reasonable diligence.

Having been placed on inquiry notice but not having exercised reasonable diligence in investigating the fraud, appellants cannot now claim that the doctrine of fraudulent concealment tolled the section 13 statute of limitations. Appellants were placed on inquiry notice at the time they had the opportunity to examine the offering memorandum in light of Sinclair's representations, *i.e.*, in December 1979. In order to file their claim within the one-year statute of limitations, appellants would have had to start this suit in December 1980. The action was not commenced until December 1981 and is therefore barred.

### III. *Claim Under Section 10(b) of the Securities Exchange Act of 1934*

Because this portion of the case is on review from the granting of a summary judgment motion, we begin our analysis by restating what should by now be indelibly etched in the minds of all parties who avail themselves of Rule 56 before this circuit:

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The court must examine the record "in the light most favorable to ... the party opposing the motion." *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1972).

Similarly the court must indulge all inferences favorable to the party opposing the motion. These rules must be applied with recognition of the fact that it is the function of summary judgment "to pierce formal allegations of facts in the pleadings ...", and to determine whether further exploration of facts is necessary.

The language of Rule 56(c) sets forth a bifurcated standard which the party opposing summary judgment must meet to defeat the motion. He must establish the existence of an issue of fact which is both "genuine" and "material." A material issue is one which affects the outcome of the litigation.

*Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975) (citations omitted), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

As the Supreme Court has recently amplified, the existence of some alleged factual dispute will not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). Materiality is defined by the substantive law governing the case. *Id.* at 2510. To establish a claim under section 10(b) of the Securities Exchange Act, a plaintiff must prove, in connection with the purchase of a security, that the defendant, with scienter, falsely represented or omitted to disclose a material fact upon which the plaintiff justifiably relied.

To defeat this summary judgment motion, appellants must show that a reasonable trier of fact could conclude that, in connection with the purchase of the limited partnership units, Sinclair, with scienter, made false representations or omissions, that appellants relied upon these false representations or omissions in deciding to purchase the units, and that such reliance was justifiable. Viewing all allegations in the light most favorable to the appellants, we find that a reasonable trier of fact could conclude that in connection with the purchase of the limited partnership units, Sinclair, with scienter, did indeed make false representations and omissions, and that the appellants did rely on these false representations and omissions in deciding to purchase the securities. This is as far, however, as any reasonable trier of fact could go.

A number of factors have been used by courts in examining whether reliance on misrepresentations is justified. These include

(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Zobrist v. Coal-X Inc.*, 708 F.2d 1511, 1516 (10th Cir.1983) (citations omitted). While no single factor is determinative, *id.* at 1516–17, the balancing of all relevant considerations in this case tips the scale in only one direction.

First, the court need not closely examine the sophistication of appellants in securities and finance, although it is plain from the record that the appellants are wealthy attorneys, wealthy enough to raise $20,000.00 in cash and bold enough to sign promissory notes of $180,000.00 on this single invest-

ment. Appellants invested these sums with the brokerage firm that they admit they have dealt with for some time. They are not neophytes. Second, although they had previously dealt with one particular Josephthal broker, on this investment appellants were introduced to a new member of the firm who advised them. There was no record of trust between appellants and Sinclair. Third, the advice Sinclair gave, however, consisted of oral misrepresentations completely at odds with the offering memorandum. This is precisely the relevant information that appellants needed: it exposed the possibility of fraud. Any fiduciary relationship here must therefore be considered suspect at this point. The continuing concealment of the fraud, the fifth factor to consider, was only possible because of appellants' blind faith in one set of statements concerning NRG. Further, that blind faith cannot vitiate their opportunity to detect the fraud. The specificity of the misrepresentations is exacting as well. The contradictions fairly lept from the pages of the offering memorandum when Sinclair spoke. For example, either this endeavor would or would not be profitable at the prevailing price of coal. Finally, it was appellants who sought out this unusual tax shelter, although appellees found for them the specific operation.

Taken together, these factors can lead to but one conclusion, that of the complete absence of justifiable reliance. No judge, no jury, in the faithful exercise of its factfinding duty, could come to any other decision. Justifiable reliance cannot be satisfied by this reckless conduct. *Compare Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978) (outlining traditional elements of section 10(b) claim), *with Zobrist*, 708 F.2d at 1516 (reckless conduct by defrauded party is unjustifiable as a matter of law). Justifiable reliance may be decided as a matter of law and we can think of no facts as egregious as these that would not fully support such a ruling. When they closed their eyes and passively accepted the contradictions between Sinclair's statements and the offering memorandum, appellants could not be said to have justifiably relied on the misrepresentations. Without this

element, appellants' claim under section 10(b) must fail.

**IV. *Fraud Claim Under Massachusetts Common Law and Section 410 of the Massachusetts Securities Act***

■ The articulated standard for the intentional tort of fraudulent misrepresentation under Massachusetts common law is that

the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.

*Danca v. Taunton Savings Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982) (citations omitted). Although this oft-repeated standard does not explicitly incorporate the notion of *justifiable* reliance, the Supreme Judicial Court of Massachusetts has not allowed fraud claims to lie when reliance could not be reasonable as a matter of law. *Saxon Theatre Corp. v. Sage*, 347 Mass. 662, 666–67, 200 N.E.2d 241, 244–45 (1964). We feel that such a gloss is wholly appropriate when, as here, the Massachusetts common law of fraud is applied to securities.

■ Appellants' claim under section 410 of the Massachusetts Securities Act is an easier case. The statute itself contains a plain reasonable reliance requirement. Under the same analysis as section III, *supra*, we conclude that no trier of fact could find that appellants reasonably relied on the misrepresentation, and, therefore, we affirm the grant of summary judgment against both of appellants' pendent claims.

**V. *Registration of Limited Partnership Under Massachusetts Securities Act***

■ The Massachusetts Securities Act provides that:

It is unlawful for any person to sell any security in the commonwealth unless (1) it is registered under this chapter or (2) the security or transaction is exempted under section 402.

Mass.Gen.Laws ch. 110A, § 301. Section 402(b)(9), a private placement provision, al-

lows an exemption for unregistered securities if the security is offered to less than twenty-five qualified persons for investment purposes only and if, five days after filing for the exemption, the state secretary does not disallow it. It is undisputed that Josephthal filed for the 402(b)(9) exemption and the secretary did not disallow the exemption.

Appellants argue that certain persons to whom the security was offered were not qualified, in that they did not hold the partnership units for investment purposes. However, appellants have pointed to nothing tending to demonstrate that *Josephthal,* in the words of section 402(b)(9), did not "reasonably believe[ ] that all the buyers ... [were] purchasing for investment." Thus, appellants failed to create a genuine issue of material fact and the grant of summary judgment on this claim was appropriate.

VI. *Denial of Leave To File Second Amended Complaint*

 "Leave to amend a pleading under Fed.R.Civ.P. 15(a) is a matter within the discretion of the trial court, and an order denying leave to amend will be reversed only for an abuse of that discretion." *Isaac v. Harvard University,* 769 F.2d 817, 829 (1st Cir.1985) (citations omitted).

We find no such abuse in this case. The district court clearly laid out its reasons why leave was denied: (1) discovery would have to be reopened after the accumulation of an extensive and expensive record and after the legal issues involved had already been developed; (2) the additional allegations contained no newly discovered evidence or facts of a different character that would change appellants' basic claims; and (3) the threshold issue of justifiable reliance would still prove an insurmountable obstacle to recovery. In addition, the district court noted that the motion to amend came after summary judgment was under advisement. Under these circumstances, the motion for leave to amend could be viewed as an attempt to avoid an adverse ruling on summary judgment. *See, e.g., Local 472 v. Georgia Power Co.,* 684 F.2d 721, 724 (11th Cir.1982). We cannot say

that the district court abused its discretion in denying the amendment.

## VII.

For the above reasons, the judgment and rulings of the district court are affirmed in all respects.