Arthur R. **MYERS**, II, Mary J. Myers, and Arthur R. Myers, III, Plaintiffs,

v.

Robert **FINKLE**, et al., Defendants.

Civ. A. No. 89–571–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 28, 1990.

Herbert Beigel, Lewis S. Sandler, Stephen D. Sharp, Beigel & Sandler, Chicago, Ill., and Charles E. Payne and Reid H. Ervin, Payne, Gates, Farthing & Radd, Norfolk, Va., for plaintiffs.

Wayne Lustig, Mays & Valentine, Norfolk, Va., and Stephen A. Northup, Mays & Valentine, Richmond, Va., for defendants.

## OPINION AND ORDER

DOUMAR, District Judge.

This action was brought to recover damages for alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder (Count I), and of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (Count V). Plaintiffs have added pendent state law claims for fraud (Count II), breach of fiduciary duty (Count III), and negligence (Count IV).

The plaintiffs allege that as a result of advice received from defendants, their accountants, they invested large sums of money in real estate limited partnerships, which the defendants represented to have the potential to reduce their tax liabilities and to gain profit. They allege that defendants were guilty of fraud and misrepresentation in giving this advice, on which they relied to their considerable detriment.

The complaint as amended is against twelve named individuals and 20 John Does doing business as two partnerships, Finkle & Co., an accounting firm, and Exec Associates.

The defendants have moved to dismiss all counts for failure to state a claim under Fed.R.Civ.Proc. 12(b)(6).[1] In the alternative, they have moved to dismiss Counts I, II, and V for failure to plead fraud with sufficient particularity under Rule 9(b).

By order of this Court dated April 4, 1990, United States Magistrate William Prince was designated to conduct a hearing and to submit to a judge of the Court a report and recommendation for disposition by the judge of defendants' motions. After a hearing and submission of additional material, Magistrate Prince entered his report July 16, 1990, recommending dismissal of the case. Plaintiffs have filed objections to the report and recommendation, to which defendants have responded. The Court subsequently heard oral argument from the parties, and now considers the record *de novo*. *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

The 12(b)(6) motion to dismiss Count I is treated here as a motion for summary judgment because of the supporting affidavits, deposition transcripts, and other documents supplied by the parties. This motion is based chiefly upon two grounds. First, defendants, as plaintiffs' accountants, were under no duty to disclose the risks associated with the purchase of interests in real estate limited partnerships for tax shelter purposes. Second, even if the defendants were under such a duty, the risks were fully disclosed in the documentation provided in connection with the investments.

Summary judgment may be granted if the pleadings and evidentiary material "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c). When a motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Proc. 56(e).

The Court FINDS that, as to Count I, there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. Summary judgment in favor of the defendants is GRANTED on Count I. Defendants' motion to dismiss Count V is GRANTED. Counts II, III and IV are DISMISSED for want of subject matter jurisdiction.[2]

### FACTS

The following is a summary of the material facts construed in the light most favorable to plaintiffs, the non-moving parties. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142. Factual allegations of the defendants which vary with those of the Myers are not considered on this motion for summary judgment. However, facts stated by the defendants which have not been challenged by the plaintiffs are included.

The plaintiffs in this case are Richard Myers, his wife Mary, and their son Rick. The Myers own several closely held businesses engaged in the harvesting and processing of clams. Amended Complaint para. 4. The individual defendants were all partners in Finkle & Company (herein referred to as "Finkle & Co." to avoid confusion with Robert Finkle, one of the individual defendants), a public accounting firm. The individual defendants were also all partners of Exec Associates, f/k/a FKL Associates. Amended Complaint para. 5. In 1977 Finkle & Co. began rendering tax and accounting services to the Myers' com-

1. As discussed by Magistrate Prince, seven of the twelve individual defendants and one of the partnerships had joined in the motions to dismiss but had also moved to dismiss for insufficiency of service of process. Two others had not appeared. By answer to interrogatories from Magistrate Prince, service of process on all named defendants was conceded. Mag.Report p. 3. Because of the commonality of issues involved in this opinion, this order will apply to all defendants.

2. The Court therefore does not reach the Rule 9(b) motion.

panies, and personal tax services to the Myers. Amended Complaint para. 6.

Robert Harmon (not a party), a former partner of Finkle & Co., left that firm in 1980 to form Harmon Associates ("Harmon"). Harmon was the general partner of Berg Harmon Associates, f/k/a Berg–Harquel Associates ("Berg Harmon"), a joint venture with Berg Ventures, Inc. Berg Harmon syndicated a series of real estate limited partnership agreements referred to as Harmon Limited Partnerships (HLPs). These entities are limited partnerships which purchase real estate properties, such as apartment buildings, and sell limited partnership interests to wealthy investors. The investors may then "shelter" themselves from high tax rates by subtracting from their incomes their pro rata shares of partnership losses. This practice was permitted by the tax laws in effect at the time the Myers invested in these partnerships. Wetter aff. para. 4.

Berg Harmon was the general partner in all but one of the HLPs involved in this suit. Amended Complaint para. 7. Exec Associates was a limited partner of Harmon Associates, and as such received distributions of profits from Berg Harmon. Exec Associates owned a 40% interest in Harmon, which had a 50% interest in Berg Harmon. The individual defendants thus had a 20% ownership interest in Berg Harmon. Amended Complaint para. 8; Finkle Dep. pp. 53, 64.

Beginning in 1981 Stephen Wetter and Robert Finkle, defendants and partners of Finkle & Co., advised the Myers that they should invest in HLPs, which offered tax shelters. These recommendations were often made during the final preparation of the Myers' tax returns. Finkle & Co. advised the Myers that Berg Harmon would provide the subscription documents. Amended Complaint paras. 9, 11.

On several occasions Wetter or Robert Finkle assured the Myers that investments in the HLPs were conservative investments which would result in "economic profit" to the investors. Amended Complaint paras. 10, 12; Mary Myers Aff. para. 4; Richard Myers Aff. para. 6.

Finkle & Co. never advised the Myers that sale of the investments or foreclosure on partnership properties would trigger recapture tax liabilities. Sale of all the Myers' interests would result in tax liability in excess of $850,000. Amended Complaint paras. 13, 15, 22.

The Myers, relying solely on the representations and advice of Finkle & Co. and making no independent investigation, invested a total of $4,845,000 in 15 HLPs between September 1981 and January 1985. Amended Complaint paras. 14, 16.

Of the first 11 investments made by plaintiffs in HLPs, most were in the amount of $150,000 (one was in the amount of $75,000, another for $300,000, and a third for $450,000). In 1984 defendant Wetter advised heavy investment in HLPs. In answer to Mrs. Myers' cash flow concerns, Wetter advised her that earlier HLPs could be sold profitably. (There is no evidence that the Myers have ever attempted to sell any of their interests in the HLPs.) Amended Complaint para. 13; Mary Myers Aff. para. 7. Plaintiffs invested $1,920,000 in a twelfth HLP (the Friendly Hills partnership), and a total of $900,000 in three more HLPs.

The Myers contend that Finkle & Co. failed to disclose the following alleged facts:

1) that the HLPs paid substantially more than fair market value for the properties;

2) that the appreciation of the properties could never outpace the amounts due on their mortgages;

3) that the investments had no potential for profit because of the large fees taken by Berg Harmon and its affiliates;

4) that the Myers would be subject to recapture tax liability if their interests were sold;

5) that the Myers' interests could be resold profitably;

6) that Harmon, the general partner of Berg Harmon, was spun off from Finkle & Co. for the purpose of developing the HLPs; and

7) that Finkle & Co. had a financial stake in the fees paid to Berg Harmon and its affiliates.

The Myers contend that the HLPs had no potential for economic profit, and that Finkle & Co. knew of their precarious financial position. Amended Complaint paras. 19, 23; Objections to Magistrate's Report at 7–10, 13–14.

The defendants assert that the financial projections for the HLPs in which the Myers invested, which were prepared by different firms of independent certified public accountants, "showed projected losses from the operation of the projects for each year over a period of several years. In no case was a profit projected for any year. The financial projections also show the projected benefits to high tax-bracket investors, which were tax savings rather than economic profits." Wetter Aff. para. 13, 14.

The defendants also state that independent appraisals were obtained for the HLP properties, that the purchase prices for the properties were supported by the appraisals, and that the IRS did not challenge these valuations. Wetter Aff. paras. 18–19. The IRS has not disallowed any deductions taken by the Myers. Para. 20.

In addition, the partners of Finkle & Co. have themselves invested in many of the same HLPs in which the Myers invested. Wetter Aff. para. 23.

The Myers admit that every year they have taken tax deductions relating to their investments in HLPs, but contend that in some years they were unable to take full advantage of all the deductions because the deductions were so great. All but two of the HLPs in which the Myers invested were, as of December 1987, operating at great losses, and several had filed for bankruptcy. Amended Complaint paras. 20, 21.

The defendants contend that the Tax Reform Act of 1986 "had devastating effects on the real estate tax shelter industry." As stated by Stephen Wetter in his affidavit:

[T]he period over which depreciation on real estate could be taken was increased, thereby reducing the amount deductible each year, the maximum income tax rate was reduced to 28%, favorable treatment of capital gains was eliminated, and most significantly, the right of taxpayers to offset losses from passive investments, such as real estate tax shelters, against their ordinary income, was phased out. The effect of the Tax Reform Act operated to reduce the values of tax shelter real properties, because they became less desirable to prospective purchasers. This legislation caused the demise of several well-known real estate syndicators.

The Tax Reform Act had a substantial negative effect on the values of the properties owned by the Harmon Limited Partnerships, thereby reducing the ultimate potential economic profit to investors if and when those properties are resold. The Tax Reform Act also substantially reduced the value of the annual losses from the Harmon Limited Partnerships to plaintiffs for tax purposes.

These changes were not foreseeable at the time the Myers invested in the HLPs. Wetter Aff. paras. 21–22. This assessment is nowhere disputed by the Myers.

### SECTION 10(b)

The defendants' first ground for summary judgment on plaintiffs' § 10(b) claim is their contention that accountants who are retained to provide tax services, and who are neither issuers nor sellers of securities, have no duty to disclose the economic risks of investments made by their clients in order to reduce tax liability. The Myers dispute this. Neither party offers any case law in support of its position.

■ In Virginia, an accountant may be held to have a fiduciary duty. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 447, 318 S.E.2d 592, 595 (1984). That duty is limited to the purposes for which the accountant is employed. *Id.* The Myers' own complaint indicates that Finkle & Co. rendered only tax advice and accounting services. Any duty Finkle & Co. owed to the Myers was limited to such advice.

Finkle & Co. became the Myers' accountants and tax advisors in 1977. Amended Complaint para. 6. In 1981 defendants Wetter and Finkle began advising the Myers to invest in HLPs. The complaint indicates that the advice to invest in HLPs was offered as *tax* advice. The defendants "advised the Myers that they should make investments in real estate limited partnerships *which offered a tax shelter." Id.* para. 9 (emphasis added). The Myers state that each investment in an HLP resulted from a recommendation, made during the preparation of their tax returns, that they invest in more tax shelters. *Id.* para. 11. There is no evidence that the Myers have ever retained the defendants to give, or that the defendants have offered to give, generalized investment advice.

The complaint vaguely alleges that defendants Wetter and Finkle falsely advised that the HLPs would result in an "economic profit." *Id.* paras. 10, 12. This representation, however, referred to tax savings rather than a direct return on the investment. Wetter Aff. para. 13. A tax shelter by its very nature is an investment which results in losses which may be used to reduce the investor's overall tax liability.

The defendants have offered evidence that the Myers reaped considerable tax benefits from these investments. For instance, Richard and Mary Myers reported a seven-figure adjusted gross income for 1984, after deducting an even greater loss from the HLPs. The loss allocable to them from the Friendly Hills investment alone was approximately $1,000,000, even though their principal payment on that investment in 1984 was less than $100,000. Wetter Aff. para. 17.

The Myers have not challenged these figures. Indeed, the Myers admit taking deductions relating to their interests in HLPs every year. Amended Complaint para. 20. Nowhere in their voluminous pleadings and affidavits do the Myers contend that their investments did not provide the tax shelter benefits promised by the defendants.

While a business relationship did exist between the Myers and Finkle & Co., it entailed only the rendering of accounting services and tax advice. The Myers have not shown that the tax advice given by Finkle & Co. with respect to the HLPs was in any way fraudulent or deficient.

Although the fact that Finkle & Co. fulfilled its duty as tax advisor to the Myers is a significant factor in determining whether plaintiffs have a § 10(b) claim, 10(b) liability does not turn on that aspect alone. Section 10(b) provides merely that any person who employs fraud in connection with the sale of a security shall be liable for securities fraud.[3]

To establish a claim under section 10(b), a plaintiff must prove, in connection with the sale or purchase of a security, that the defendant, with intent to deceive or defraud, falsely represented or omitted to disclose a material fact upon which the plaintiff justifiably and detrimentally relied. *Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 804 (1st Cir.1987); *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1516 (10th Cir.1983). The primary issue involved in this motion for summary judgment is whether the Myers justifiably relied on the representations of Finkle & Co.

*Zobrist* and cases which have followed it have focused on three primary

---

**3.** Section 10(b) states:

It shall be unlawful for any person ...—
(b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe....

15 U.S.C. § 78j(b).

Rule 10b–5 provides:

It shall be unlawful for any person ...
(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

factors in determining whether reliance is justified:

1) the existence of a fiduciary relationship or longstanding business or personal relationships;

2) the sophistication and expertise of the plaintiff in financial and securities matters;

3) access to the relevant information and opportunity to detect the fraud;

These and any other relevant factors should be considered to determine whether reliance was justified. *Zobrist v. Coal–X,* 708 F.2d at 1516; *accord Bruschi v. Brown,* 876 F.2d 1526, 1529 (11th Cir.1989) *and Kennedy v. Josephthal & Co.,* 814 F.2d at 804. Determination of whether reliance is justified is a question of law appropriate for resolution by summary judgment. *See Bruschi v. Brown,* 876 F.2d at 1530; *Kennedy v. Josephthal & Co.,* 814 F.2d at 805. The Court's inquiry should be whether "the balancing of all relevant considerations in this case tips the scale in only one direction." *Kennedy v. Josephthal & Co.,* 814 F.2d at 804.

The first factor, the nature of the relationship between the parties and the duty of the defendants, has already been discussed, and tips the scale in favor of the defendants. The second factor, the Myers' expertise in financial and securities matters, also tilts the balance in the defendants' favor. The defendants characterize Mary as an astute businesswoman who negotiates complex financing arrangements for the Myers companies, and Richard as an officer and executive of several fishing corporations. Wetter Aff. para. 2. The Myers, to the contrary, characterize Richard Myers as only a fisherman, and Mary as the company bookkeeper. They claim that both were completely unsophisticated in investments, had never invested in the

stock market and had never heard of tax shelters. Mary Myers Aff. paras. 2–3.

The level of the Myers' sophistication is a material issue of fact as to which there is a genuine dispute. However, the income of Richard and Mary Myers annually exceeded $1,000,000, and the last financial statement prepared for the Myers by Finkle & Co. showed their net worth in excess of $18,000,000. Wetter Aff. para. 4. The Myers owned several fishing corporations, and were willing to invest almost $5,000,000 in tax shelters. In *Kennedy v. Josephthal & Co.,* the First Circuit indicated that plaintiffs wealthy enough to raise $20,000 in cash and bold enough to sign promissory notes of $180,000 on a single investment necessarily had some financial acumen. 814 F.2d at 804–05.

While the Myers may not have been savvy investors, the Court can only presume that they were versed in the ways of business and that they had more than an average ability to understand tax shelters and other financial matters, as well as the ability to read and understand investment subscription documents.[4] This touches the third factor, the Myers' access to the relevant information and opportunity to detect the fraud.

In conjunction with each investment, Berg Harmon provided the Myers with a Private Placement Memorandum (PPM) describing the prospects and risks involved in the investments. The PPMs apparently all contained substantially the same information.[5] The Myers state that there was usually a rush to sign the subscription documents, which were sent to them by Federal Express and marked with paper clips where the Myers should sign. The PPMs sometimes did not arrive until after the subscription documents were signed. The Myers complain that "there was a rush to

---

**4.** Indeed, the subscription agreement for the plaintiffs' first investment, in Tampa Mirada Associates, Ltd., contains representations by Richard Myers that he is experienced in investment and business matters and familiar with the concept of real estate tax shelters; that he is capable of evaluating the merits and risks of the prospective investment; and that he has read and understands the offering memorandum.

**5.** The investment documents supporting the Tampa Mirada investment were entered in the record in response to an intermediate order of Magistrate Prince dated May 31, 1990. Copies of the documents relating to the Friendly Hills partnership, signed by Richard Myers, are attached as exhibits to the affidavit of Stephen Wetter.

get the documents signed and that there was no time for us to study the PPMs. Moreover, Wetter never advised us to study the PPMs." Mary Myers Aff. para. 6.

However, it is absolutely clear that the Myers had access to the PPMs and the information contained in them. The Myers have not claimed that they made the first investment without the opportunity to study the PPM. To the contrary, the Subscription Agreement for the Myers' first investment, in Tampa Mirada Associates, Ltd., signed by Richard on September 25, 1981, states that Richard was provided a copy of the PPM. Certainly after reviewing the first PPM, the Myers should have understood the nature of their subsequent investments.

The Tampa Mirada and Friendly Hills PPMs contradict all of the alleged misrepresentations and omissions concerning the tax aspects of the investment, as to which Finkle & Co. had a duty. The PPMs repeatedly warn of "substantial risks relating to the availability, timing and amount of tax benefits resulting from an investment in the partnership," (Tampa Mirada p. 5; Friendly Hills p. 4) and of adverse tax consequences in the event of foreclosure. (Tampa Mirada pp. 7, 23; Friendly Hills pp. 6, 28.) The PPMs contain a lengthy analysis of tax considerations (Tampa Mirada pp. 43–61; Friendly Hills pp. 58–91), including warnings that sale of the investor's interest may well result in tax liability in excess of the cash distributed from the sale. (Tampa Mirada p. 55; Friendly Hills p. 79.) The PPMs repeatedly warn that the IRS

might analyze the investment differently. The PPMs also warn that changes in the tax laws might affect the tax consequences, which is in fact what occurred in this case.

The PPMs also disclosed to the Myers all other relevant information which they complain Finkle & Co. did not convey to them, even though, as the Court has found, Finkle & Co. had no duty to advise the Myers on those aspects of the investments. With regard to profitability, the Friendly Hills PPM contains dire warnings that the investor faces a risk of complete loss of his investment. On page 1, the PPM warns "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK. INVESTORS ARE URGED TO READ THE SECTION ENTITLED RISK FACTORS." [6] See also Tampa Mirada pp. 5–6, 7. The nine-page assessment of the risk factors discusses certain risks associated with investment in garden-apartment complexes, which relate to tenant defaults, demographic and economic conditions, and other factors beyond the control of the partnership. (Friendly Hills pp. 27–35; see Tampa Mirada pp. 21–34.)

The PPMs also indicate that, notwithstanding the risk of loss, the investment would not be profitable. On page 1 the Friendly Hills PPM discloses:

SUBSTANTIALLY ALL OF THE PROCEEDS OF THIS OFFERING WILL BE DISTRIBUTED EITHER: (I) IN PAYMENT OF PRINCIPAL AND/OR INTEREST ON DEBT ENCUMBERING THE PROPERTY; (II) IN PAYMENT OF EXPENSES INCURRED IN CON-

6. The PPM goes on to warn:
THE INVESTMENT DESCRIBED IN THIS MEMORANDUM INVOLVES A HIGH DEGREE OF RISK. SEE RISK FACTORS. PURCHASE OF UNITS SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE POSSIBILITY OF A TOTAL LOSS OF THEIR INVESTMENT AND WHO ARE NOT SEEKING A CURRENT CASH RETURN ON INVESTED CAPITAL. IN ADDITION THE INVESTMENT IN A PARTNERSHIP INTEREST MAY TEND TO BE TOTALLY ILLIQUID IN THAT IT CAN NOT BE SOLD OR OTHERWISE CONVERTED TO CASH. THERE IS NO PUBLIC MARKET OR OTHER ORGANIZED MARKET FOR THE

UNITS AND IT IS NOT ANTICIPATED THAT ONE WILL DEVELOP. [pp. 4–5.]

. . . . .

SUBSTANTIAL RISKS EXIST RELATING TO THE OWNERSHIP AND OPERATION OF THE PROPERTY. THESE INCLUDE, BUT ARE NOT LIMITED TO, THE POSSIBILITY OF FUTURE OPERATING DEFICITS WHICH COULD RESULT IN FORECLOSURE OF THE LIENS ENCUMBERING THE PROPERTY. IN SUCH EVENT, INVESTORS COULD LOSE THEIR ENTIRE INVESTMENT AND INCUR SIGNIFICANT TAX LIABILITIES, WITHOUT RECEIVING CASH PROCEEDS WITH WHICH SUCH TAX LIABILITIES COULD BE DISCHARGED. [p. 6.]

NECTION WITH THIS OFFERING; OR (III) AS FEES TO VARIOUS TRANSACTION PARTICIPANTS.

The commissions received by Berg Harmon and its affiliates are detailed at pages 52–57. (*See* Tampa Mirada at 19, 40–43.) The PPM also states that the "acquisition of the property was highly leveraged due to the Wraparound Mortgage. Accordingly, there will be substantial obligations due periodically for debt service." (p. 28.)

Regarding the transferability of the investment, the Friendly Hills PPM states: "THERE WILL BE NO PUBLIC MARKET FOR THE UNITS OFFERED HEREIN. SUCH UNITS ARE THEREFORE SUITABLE ONLY FOR LONG–TERM INVESTMENT, AND TRANSFERS MAY TAKE PLACE ONLY WITH THE CONSENT OF THE GENERAL PARTNER AND UPON THE OCCURRENCE OF CERTAIN EVENTS." (p. 2.)

With respect to Finkle & Co.'s financial interest in the HLPs or Berg Harmon, Finkle & Co. sent a disclosure letter to the Myers "so that it is made certain you are fully aware of our relationship with Berg Harmon Associates." Exhibit 3 to Wetter Aff. That letter states that Robert Harmon, the general partner of Harmon Associates, was formerly a partner of Finkle & Co., and that Finkle & Co. performs services for Berg Harmon. The letter also informs the Myers that the partners of Finkle & Co. are also partners of FKL Associates (the predecessor of Exec Associates), which is a limited partner of Harmon Associates, a joint venture partner in Berg Harmon. More or less the same information is contained in the PPMs (Tampa Mirada p. 11; Friendly Hills p. 49).

Finally, in signing the subscription agreements the Myers attested that they had read and understood the PPMs, including all the above provisions.[7]

The PPMs thus directly contradicted every alleged misrepresentation or omission by Finkle & Co., and should have alerted the Myers to discount the reliability of the statements made by Finkle & Co.[8] The Myers, as astute businessmen, cannot complain that Wetter or Finkle told them it was not necessary to read the PPMs. The tax advice given by the defendants was supported by the offering documents. If the Myers had questions concerning other aspects of the investment, they should have sought advice on those aspects, from Finkle & Co., an investment advisor, or an attorney. Their failure to do so is their

---

**7.** The Tampa Mirada subscription agreement contained representations by Richard Myers that he understood that there were substantial risk factors which were described in the PPM; that there were numerous potentially adverse tax consequences which were also described in the PPM; that the investment was speculative, involving a high degree of risk and loss of an investor's entire investment; and that Myers might have to hold the partnership interest indefinitely and that it might not be possible to liquidate his investment. Pages 3–5.

The subscription agreement also contained a representation that Myers had had the opportunity to review the investment documents to his satisfaction. Pages 5–6.

**8.** The Myers complain that the PPM did not disclose that, as they believe, the investments would *necessarily* result in a loss. They assert that Finkle & Co.'s representations concerning economic profit are not directly contradicted by the offering materials, which merely revealed the possibility of loss, rather than its inevitability. Obj. to Mag.Report at 23.

The Court must reject several of the Myers' characterizations. First, as noted earlier, Finkle & Co.'s statements referred to tax savings rather than direct profit on the investment. Second, while it stands to reason that an investment in such a speculative and volatile market as real estate has a high risk of loss, too many variables exist to assert that such an investment has absolutely *no* possibility of earning a profit. Third, examination of the offering materials shows that they did more than reveal the *possibility* of a loss; rather, they clearly stated the *high probability* of a loss.

The proper inquiry is whether the representations or omissions made by Finkle & Co. are contradicted by the PPMs so as to make the representations of Finkle & Co. "palpably false" and unreliable. The PPMs' disclosure of a high probability of a loss clearly contradicts any representation by Finkle & Co. that the investment would return a direct profit, if any such representation were in fact made.

The Court also observes that whether or not the disclosure in the PPMs of only a probability of loss is itself fraudulent is irrelevant to the Myers' suit against Finkle & Co. Berg Harmon, the offeror of the investments, and not Finkle & Co. is liable for misrepresentations in the PPMs themselves.

own error in business judgment. Finkle & Co. concealed no information from the Myers.

A purchaser of securities "may not reasonably or justifiably rely on a misrepresentation where its falsity is palpable." *Zobrist*, 708 F.2d at 1517 (quoting *Holdsworth v. Strong*, 545 F.2d 687, 694 (10th Cir.1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977)). The applicable test is whether

> the plaintiff's reliance was justified; that he did not intentionally close his eyes and refuse to investigate, concerning the circumstances, in disregard of a risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

*Zobrist*, 708 F.2d at 1517. The Court finds from the pleadings and the facts read most favorably to the Myers that the Myers did disregard a risk that was obvious to them.

On facts virtually identical to those in this case, the Tenth Circuit found that the investor "acted recklessly by intentionally closing his eyes to and failing to investigate the contradiction between the misrepresentations and the information in the memorandum. As a matter of law, [the investor] could not rely on the misrepresentations without further inquiry." *Zobrist*, 708 F.2d at 1518-19. The Fourth Circuit cited *Zobrist* in *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir.1986), stating: "To recover in an action for securities fraud, individual class members must demonstrate that the omitted information was not otherwise available to them."

Other courts in similar cases have found that investors failed to show fraud under § 10(b). *See Kennedy v. Josephthal & Co.; Luce v. Edelstein*, 802 F.2d 49 (2d Cir.1986); *Ruff v. Genesis Holding Corp.*, 728 F.Supp. 225, 229 (S.D.N.Y.1990); *Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168 (S.D.N.Y.1988). While the Myers can point to inevitable distinctions between this case and the ones cited, this Court FINDS as a matter of law that Finkle & Co. fulfilled its duty to advise the Myers as to the tax shelter consequences

of investment in the HLPs, and that the offering documents prevent the Myers from asserting a fraud with respect to any alleged misrepresentations or omissions on the part of the defendants, which the Court finds were disclosed in the offering documents themselves.

Defendants' motion for summary judgment on Count I is accordingly GRANTED.

## RICO

In addition to their § 10(b) claim, the Myers allege in Count V violations of 18 U.S.C. § 1962(a), (c) and (d). Common to these provisions are the elements of a (1) person, (2) an enterprise, (3) a pattern of (4) racketeering activity (5) which causes injury to the plaintiff. Magistrate Prince found that the Complaint did not sufficiently allege elements (1), (3) and (4).

*Person*

A RICO complaint must identify each "person" who is alleged to be liable. Collectivizing "defendants" in the alleged pattern of racketeering activity will not suffice. *Wichita Federal S. & L. v. Landmark Group*, 657 F.Supp. 1182, 1190 (D.Kan.1987). The defendants in this case are twelve named partners of Finkle & Co., twenty John Does, Finkle & Co. itself, and Exec Associates. The factual allegations of the Amended Complaint refer only to the activities of Stephen Wetter and Robert Finkle. Nowhere do the plaintiffs tie the activities of those two individuals to their partners or to Finkle & Co. The plaintiffs admit that "only Robert Finkle and Stephen Wetter dealt directly with the plaintiffs in the sale of the Harmon investments." Objections to Magistrate's Report at 40. Nevertheless, the RICO count in the Amended Complaint refers only to "Finkle," which is the plaintiffs' designation for Finkle & Co. Amended Complaint paras. 5, 46-55.

In another case, dealing only with a § 1962(d) RICO conspiracy claim, a district court held:

> A complaint which merely implies that a defendant is responsible for someone else's fraudulent acts is insufficient to

satisfy section 1962(d). A plaintiff alleging conspiracy must identify the nature of the conspiracy and the defendant's role in it with particularity. Most importantly, since conspiracy rests on agreement, the plaintiff must allege with some particularity facts sufficient to show an agreement between the parties to inflict the alleged wrong. Further, the plaintiff must allege that the defendants agreed to one of the uses or effects of that pattern of racketeering activity which the statute expressly prohibits, such as conducting the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(c).

*Midwest Grinding Co. v. Spitz,* 716 F.Supp. 1087, 1093–94 (N.D.Ill.1989) (citations omitted).

The Myers in their objections say that because the other individual defendants are "controlling persons" of Finkle & Co. and are liable for the fraud perpetrated by Wetter and Finkle, they have adequately identified the role each individual defendant played. No case is cited for this proposition.

Nowhere do the Myers allege that the other partners of Finkle & Co. had knowledge of or condoned the alleged fraud of Wetter and Finkle. The Court ACCEPTS Magistrate Prince's recommendation that this lack of specificity renders the pleading of the "person" element defective, and so FINDS. This suffices to dismiss the RICO count under Rule 12(b), at least as to all defendants other than Wetter and Finkle.

*Pattern*

■ Magistrate Prince found under *Meadow Ltd. Partnership v. Heritage S. & L.,* 639 F.Supp. 643 (E.D.Va.1986) that a "pattern" of racketeering activity was not alleged because there was no evidence of any threat of continuing racketeering activity or the involvement of an organized *criminal* enterprise. This conclusion is essentially on the mark, but bears closer examination in light of the recent Supreme Court decision in *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2902–05, 106 L.Ed.2d 195 (1989). The Court declined "to invent a rule that

RICO's pattern of racketeering concept requires an allegation and proof of an organized crime nexus." Id. 109 S.Ct. at 2905.

■ *H.J., Inc.* reaffirmed the requirement that "to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity." 109 S.Ct. at 2900. Thus it is not always necessary to show more than one scheme; multiple predicates within one scheme could constitute a pattern. Plaintiffs allege one scheme comprised of several predicate acts of fraud (although as Magistrate Prince points out, only with respect to two of the investments is fraud pled with any particularity, and two do not make a pattern; *Sedima, SPRL v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285, n. 14, 87 L.Ed.2d 346 (1985)). The alleged predicate acts are clearly related; the issue is continuity.

■ The Fourth Circuit has understood *H.J., Inc.* to be consistent with its approach to the element of continuity:

[O]ur approach has been designed to determine on a case-by-case basis whether the "scope and persistence" of predicate acts was such as to demonstrate that they constituted, or sufficiently threatened, "long-term criminal conduct," so as to bring them within Congress' expressed concern with that sort of conduct rather than merely episodic criminal activity.

*Walk v. Baltimore & Ohio R.R.,* 890 F.2d 688, 690 (4th Cir.1989). The inquiry's focus is on whether the related predicate acts indicate "ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being." *International Data Bank v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987).

Factors relevant to this inquiry include: the number and variety of predicate acts; the length of time over which they were committed; the number of putative victims; the presence of separate schemes; and the potential for multiple distinct injuries.

*Brandenburg v. Seidel,* 859 F.2d 1179, 1185 (4th Cir.1988). These factors are not exclusive, and none of them is determinative. "The mere fact that the predicate acts alleged can be characterized as part of the same overall scheme does not automatically prevent their constituting a RICO pattern. Similarly, the fact that a scheme to defraud requires several acts of mail or wire fraud in order to accomplish its objective does not automatically make it a RICO pattern." *Id.*

In this case, the Myers allege the identical form of fraud with respect to 15 separate investments; over a course of 4 years; involving only three victims, the Myers themselves; subsumed under one scheme; with potential for essentially only one type of injury—the Myers' loss of money.

The facts of this case are very close to those of *Flip Mortgage Corp. v. McElhone,* 841 F.2d 531 (4th Cir.1988). In *Flip Mortgage* (a pre-*H.J., Inc.* case), two companies contracted to market computerized mortgage related services, one (FMC) supplying the financial and business expertise, the other (SCS) supplying computer services. SCS was to bill the customers and remit 70% of the proceeds to FMC. Over several years, SCS did not account for all its receipts. The Fourth Circuit found no pattern:

> It is true that FMC's allegations point to fraudulent acts spanning seven years depriving FMC of money properly due to it on many occasions. Nevertheless, FMC's own pleadings present this series of events as part of a single scheme perpetrated by SCS and its directors against a single victim.... Given the unity and narrow focus of the scheme, the fact that the planned injury was inflicted and suffered over a period of years cannot convert this single scheme into a pattern within the meaning of RICO.

841 F.2d at 538.

*Menasco, Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989), a post-*H.J., Inc.* case, is also essentially identical to this case, but for the duration of the fraud. The defendants' actions were narrowly directed toward the single goal of defrauding two corporations with respect to their oil interests; involved one perpetrator and only the two victims; and took place over one year. *Id.* at 684. The Fourth Circuit found this was not a pattern. Quoting *Zepkin* and *H.J., Inc.,* the panel found that these acts did not constitute "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being," and that the acts did not constitute "a regular way of conducting [their] ongoing business." The unsupported allegation that the defendant had similarly defrauded other victims did not save the complaint.

In light of *Flip Mortgage* and *Menasco,* the Court FINDS that plaintiffs have failed to allege a pattern of racketeering activity to support a RICO claim.

*Racketeering Activity*

Magistrate Prince concludes that this element is not met, based on his determination that plaintiffs failed to plead fraud with particularity under Rule 9(b). The Court ACCEPTS this recommendation, and so FINDS.

Plaintiffs have failed to allege a pattern of racketeering activity which would support a RICO claim. Accordingly, Count V of the Amended Complaint, which sets forth the RICO allegations, is DISMISSED.

### PLAINTIFFS' STATE LAW CLAIMS

As all of plaintiff's federal claims have been dismissed, the Court declines to exercise pendent jurisdiction over plaintiffs' state law claims. *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Counts II, III and IV are accordingly DISMISSED.

### CONCLUSION

Defendants' motion for summary judgment as to Count I is GRANTED. Defendants' motion to dismiss Count V is GRANTED. Counts II, III and IV are

DISMISSED for lack of subject matter jurisdiction.

IT IS SO ORDERED.