J. GEILS BAND EMPLOYEE BENEFIT
PLAN, et al., Plaintiffs–Appellants,

v.

SMITH BARNEY SHEARSON, INC.,
et al., Defendants–Appellees.

No. 95–1699.

United States Court of Appeals,
First Circuit.

Heard Oct. 2, 1995.

Decided Feb. 20, 1996.

Thomas J. Butters, with whom Cullen & Butters was on brief, Boston, MA, for appellants.

Barry Y. Weiner, with whom Christopher P. Litterio, William E. Ryckman and Shapi-

ro, Israel & Weiner, P.C. were on brief, Boston, for appellees.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Chief Judge.

Appellants, the J. Geils Band Employee Benefit Plan (the "Plan"), and Stephen Bladd (the "Trustee"), John Geils, Jr., Richard Salwitz and Seth Justman (the "Participants"), brought this suit alleging fraud and breach of fiduciary duty under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1994), in connection with certain investment transactions made by Appellees in 1985, 1986 and 1987. The district court granted the motion for summary judgment brought by Appellees, Smith Barney Shearson ("Shearson"), Matthew McHugh, and Kathleen Hegenbart, on the grounds that Appellants' claims are time barred under ERISA's six-year statute of limitations. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are summarized in the light most favorable to Appellants, the party opposing summary judgment. *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995).

The Plan, also known as T & A Research and Development, Inc., was formed as a pension and profit sharing plan for the employees of the J. Geils Band and, as a common plan and trust, it is subject to ERISA. In April of 1985, Bladd as the Plan's Trustee [1] opened accounts for the Plan with Shearson Lehman Brothers, Inc., a registered broker-dealer and a member firm of both the National Association of Securities Dealers (NASD) and the New York Stock Exchange (NYSE). This appeal stems from Shearson's management between 1985 and 1990 of the Plan's account and, specifically, its purchase of three limited partnerships (the first in

June of 1985, the second in September of 1985, and the third in June of 1987) and execution of a "bond swap" in May of 1986.

The Plan's accounts were handled by Hegenbart, a Shearson employee who acted as the Plan's stock broker from 1985 until Appellants transferred the accounts from Shearson in 1990. McHugh, a Shearson branch manager, supervised the accounts. Hegenbart would make a recommendation, and if Appellants accepted it and executed an order, she would receive a commission. If the recommendation was not accepted, she would not receive any compensation from Appellants. While Appellants communicated to Hegenbart that they knew very little about financial management or investment, Appellants retained decision-making authority over the Plan accounts. At no time was Hegenbart given power of attorney or discretionary authority over the accounts.

Upon opening the Plan's accounts, Hegenbart sold the securities transferred to it and one month later, in June of 1986, purchased over $500,000 of long-term zero coupon bonds ("CATS"), Shearson-managed mutual funds, and certificates of deposit. In May of 1986, Appellants swapped the CATS purchased in 1985 for other bonds upon Hegenbart's recommendation. The bond swap resulted in an overall loss to the Plan and generated over $90,000 worth of commissions—$32,000 for the bonds purchased in 1985 and $61,000 for their sale in May of 1986, and the subsequent purchase of the new bonds. The Plan was charged commissions of about 3.5% for the sale of the CATS purchased in 1985, 3.5% for the 1986 sale, and approximately 6% for the 1986 purchase of the new CATS.

Between 1985 and 1987, Appellants purchased a total of $165,000 worth of three Shearson-packaged limited partnership interests. The first was purchased in June of 1985, for $100,000. On or about the purchase date, Bladd, as Trustee, and Justman executed a Subscription Agreement under penalty of perjury. According to this agreement, they acknowledged, *inter alia,* that (i) they received the prospectus; (ii)

---

1. The record shows that prior to serving as the Plan's trustee, Bladd had no significant financial

background or experience.

there was not expected to be a public market for their investment; and (iii) there were risks involved, which the prospectus disclosed. Appellants were sent prospectuses which similarly disclosed risks involved when they purchased $40,000 worth of the second limited partnership interest in September of 1985, and when they purchased $25,000 of the third in June of 1987.

Each of the Participants, including Bladd as Trustee, received monthly statements, as did Justman's accountant, Nick Ben–Meir ("Ben–Meir"). The monthly statements disclosed the transactions which occurred during the particular month as well as a summary of the Plan's portfolio but did not separately break out the amount of commissions charged. The monthly statements listed the "face amount" of the limited partnerships, but not the market value. As of January 1986 they included the following statement: "The face amount does not necessarily reflect current market value." Appellants also received quarterly "Portfolio Reviews," which consisted of two documents: (i) a chart setting forth the Plan's portfolio, including the investment, date of purchase, amount invested, current market value, and yield, among other information; and (ii) an investment pyramid showing the relative safety of each investment and its market value, including the total account value. Unlike the monthly statements, the record shows that the portfolio review dated October 1988 lists as the market value what was actually the face amount of the interests in the limited partnerships. In the May 1990 portfolio review, the limited partnerships are listed in the "amount invested" column, with two of them appearing with undefined subtractions for "ROC" which exceed $19,000; the corresponding "market value" column is blank. Bladd, as Trustee, also received letters from McHugh as early as June of 1985 in which he offered both to help him review the Plan's investment objectives and results obtained and to discuss how Shearson could be of greater assistance.

While Ben–Meir did not receive the statements with the purpose of reviewing Hegenbart's investment decisions, the record shows he did review some potential investments as early as May of 1986. In October of 1988, Justman received a letter from Ben–Meir regarding an analysis of Justman's portfolio. In the letter, Ben–Meir communicated that he had exchanged "some extremely sharp words" with Hegenbart regarding some of the figures shown in the analysis, particularly with respect to the limited partnership interests. The letter stated that all of them are worth "far below their cost" and "strongly advise[d] [Justman] *not* to enter into any more of these types of investments," because the " 'loading' charges (fees and commissions *off the top* ), together with their continuingly reduced value for tax purposes ... make them unattractive...." (Emphasis in original). Ben–Meir then expressed that "[d]espite [Hegenbart's] repeated statements to me that she only has your best interest at heart, my instincts say otherwise, and I would urge you, once again, to request and obtain an accounting of the fees and commissions earned by Shearson and her as a result of her placing you in all these [l]imited [p]artnerships." Finally, the letter closed with the recommendation that "[i]f you decide to continue using [Hegenbart] to manage your portfolio, that's okay, but you should clearly change the amount of discretion you have been allowing, so that no purchases or sales are made without your complete review of all proposals and direction."

In late July to August 1990, the Plan accounts were transferred from Shearson. Some time thereafter, the Plan's new broker informed Bladd that the limited partnerships were unsuitable for investors desiring safety and were worth less than the amount reflected in the latest review, confirming Ben–Meir's October 1988 observations. Between the summers of 1991 and 1992, internal Shearson "activity reports" produced during arbitration proceedings brought by Justman against Shearson[2] revealed information regarding the excessive commissions, also con-

**2.** In that proceeding, *Seth Justman v. Shearson Lehman Hutton and Kathleen Hegenbart,* NASD No. 90–02937, Justman sought damages as a result of alleged unlawful actions resulting in large losses. The NASD docket reveals that these proceedings were commenced on October 19, 1990 and closed on June 3, 1992.

firming Ben–Meir's observations. Appellants maintain that they only learned of the Plan's losses resulting from the bond swap in January of 1994, when they were informed by counsel whom they had retained in October of 1992.

Pursuant to an agreement between the parties to arbitrate disputes, Appellants commenced arbitration proceedings with the NASD by filing a Uniform Submissions Agreement dated August 20, 1993, seeking recovery for alleged breaches of fiduciary duty by Appellees. On motion by the Appellees, the NASD Director ruled on May 15, 1994, that virtually all of the claims were ineligible for arbitration under Section 15 of the NASD Code of Arbitration Procedure, because all trades giving rise to the claims occurred more than six years prior to the filing of the arbitration in August of 1993.

On October 7, 1994, Appellants filed the civil action below. In their complaint, Appellants allege that Appellees violated their purported fiduciary duty[3] to the Plan under ERISA with respect to the three limited partnership interests and the "bond swap." Appellants contend the following: (i) that these transactions were unsuitable for the Plan and were inconsistent with its investment objectives; (ii) that Hegenbart, in order to obtain higher commissions, made fraudulent statements to induce the Participants, whom she knew were unsophisticated investors relying on her investment advice, into making these transactions; and (iii) that in connection with the bond swap Appellees charged commissions grossly exceeding the rate Hegenbart had represented would be charged. Appellants subsequently filed a motion compelling arbitration of all claims or, in the alternative, staying arbitration pending adjudication by jury trial of non-arbitrable claims. In response, Appellees filed an answer and counterclaim for declaratory judgment, opposition to Appellants' motion, and a motion for summary judgment as to the complaint and counterclaim.

Pending disposition of these motions, Appellants requested review of the decision by the Director of the NASD. On January 10, 1995, the arbitration panel affirmed the Director's decision. On May 9, 1995, the district court entered a memorandum and interlocutory order by which Appellees' summary judgment motion was granted. The district court concluded that Appellants' claims were time-barred under ERISA's six-year statute of limitations on the grounds that, under the fraudulent concealment doctrine as applied in this Circuit, Appellants had been placed on inquiry notice—by their receipt of the prospectuses and monthly statements—more than six years before commencing their cause of action. After voluntary dismissal of Appellees' counterclaims without prejudice, the court entered a final judgment on June 23, 1995. This appeal followed.

### STANDARD OF REVIEW

■ We review a district court's grant of summary judgment *de novo* and, like the district court, review the record in the light most favorable to the non-moving party. *See, e.g., Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36–37 (1st Cir.1995); *Woods v. Friction*, 30 F.3d 255, 259 (1st Cir.1994). Our review is limited to the record as it stood before the district court at the time of its ruling. *Voutour v. Vitale*, 761 F.2d 812, 817 (1st Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which "has the

---

**3.** Appellees' motion for summary judgment also argued that the claims were barred because Appellees were not fiduciaries under ERISA. The district court did not rule on this issue. For purposes of this appeal, we assume, without deciding, that Appellees were under a fiduciary duty. *See Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 129 (1st Cir.1987) (finding no need to resolve merit of allegations that uncles and brothers, as fellow shareholders in a close corporation, owed plaintiff a fiduciary duty). For a recent discussion of ERISA and, in particular, whether ERISA authorizes suits for money damages against nonfiduciaries who knowingly participate in a fiduciary's breach of duty, see *Mertens v. Hewitt Associates*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

potential to affect the outcome of the suit under the applicable law." *Nereida–González v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). If the moving party demonstrates that "there is an absence of evidence to support the non-moving party's case," the burden shifts to the non-moving party to establish the existence of a genuine material issue. *FDIC v. Municipality of Ponce,* 904 F.2d 740, 742 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986)). Thus, the nonmovant bears the burden of placing at least one material fact into dispute once the moving party offers evidence of the absence of a genuine issue. *Darr v. Muratore,* 8 F.3d 854, 859 (1st Cir.1993); *see also Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552 (1986) (stating that Fed.R.Civ.P. 56(c) "mandates the entry of summary judgment, ... upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). In other words, neither "conclusory allegations, improbable inferences, and unsupported speculation," *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990), nor "[b]rash conjecture coupled with earnest hope that something concrete will materialize, is [ ]sufficient to block summary judgment." *Dow v. United Bhd. of Carpenters,* 1 F.3d 56, 58 (1st Cir.1993).

## DISCUSSION

Resolution of this appeal requires that we determine whether the ERISA statute of limitations, which is codified at 29 U.S.C. § 1113,[4] applies to bar Appellants' action. Section 1113 requires that Appellants commence their action within six years from the date of the last transaction giving rise to their claim, unless they demonstrate "fraud or concealment," in which case they must commence their action within six years from the date they discover the breach.

The first step requires us to determine "the date when the last action which constituted a part of the breach or violation" occurred—one of a number of temporal determinations to be made. 29 U.S.C. § 1113(1)(A). Here, the purported violations in connection with the limited partnership interests occurred in June of 1985, September of 1985, and June of 1987, and those made in connection with the bond swap occurred in May of 1986.[5]

■ The second requires us to determine when the cause of action was commenced. The district court assumed, without deciding, that NASD Code § 18(a) tolls the statute of limitations in this case. The district court concluded that August 20, 1993, the date on which Appellants filed the Uniform Submission Agreement with the NASD,[6] should serve as the date marking commencement of the action. The district court reasoned that

4. Section 1113 provides as follows:
No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
(1) six years after (A) the date of the last action which constituted a part of the breach of the violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.
29 U.S.C. § 1113 (1994). We note that Section 1113 was amended by Congress both in 1987 and in 1989. Neither of these amendments, however, have any bearing on this appeal.

5. Appellants state in their brief that the last alleged commission overcharges occurred in December 15, 1988. Appellees contend that the last commissions were charged in June 1987. Our review of the record indicates that there was a commission charge on June 24, 1987 for (what appears to be) about $1,200. The only evidence we can find of commission charges in 1988 is a March 2, 1988 entry corresponding to a distribution where the initials "CLP" appear in the "commissions" column. We do not find this alone to be sufficient evidence supporting resolution of this "dispute" in favor of Appellants.

6. Section 18(a) of the NASD Code of Arbitration Procedure provides that "where permitted by applicable law, the time limitation which would otherwise run or accrue for the institution of legal proceedings shall be tolled where a duly executed Submission Agreement is filed by Claimants."

even by using that date, which was more favorable to the Appellants, the purported violations—in June of 1985, September of 1985, May of 1986 and June of 1987—nonetheless occurred more than six years earlier. Neither party disputes this reasoning on appeal and, because it has no bearing on the outcome, we adopt without further comment the district court's use of August 20, 1993 as the date the action was commenced.

Because Appellants filed the action below more than six years after the last transaction giving rise to the alleged violations, we turn next to the question of whether the "fraud or concealment" exception applies to toll the limitations period. Appellants argue that it does, and that the district court erred when it held to the contrary. The interpretation of the fraud or concealment clause of Section 1113 is one of first impression for this Circuit. We address the various issues this question raises in turn.

### A. Fraudulent Concealment and the Proper Discovery Standard under Section 1113

The first issue involves a determination of when the limitations period begins to run in cases of fraud or concealment under Section 1113. Resolution of this question requires us to decide what standard—objective or subjective—is to be applied when determining the "date of discovery." As the district court noted, other circuits have interpreted Section 1113 to incorporate the federal doctrine of "fraudulent concealment," which operates to toll the statute of limitations until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment. *See Larson v. Northrop Corp.*, 21 F.3d 1164, 1172–74 (D.C.Cir.1994) (Campbell, J., sitting by designation) (holding that Section 1113's fraud or concealment exception incorporates the common law fraudulent concealment doctrine); *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1093–96 (7th Cir.1992) (same); *Schaefer v. Arkansas Medical Society*, 853 F.2d 1487, 1491–92 (8th Cir.1988) (same); *see also Bailey v. Glover*, 88 U.S. 342, 349, 22 L.Ed. 636 (1875) (discussing fraudulent concealment doctrine).

After noting the approach followed in *Larson* and *Martin*, the district court concluded that, even if we were to hold that Section 1113 could be tolled by showing something less than "fraudulent concealment," Appellants would still not prevail. In reaching its conclusion, the district court reasoned that in light of our interpretation of the fraudulent concealment doctrine as applied to limitation periods contained in the Securities Exchange Act of 1933 and 1934, Appellants will have failed to meet their burden of production alleging facts of fraud or concealment if Appellees show that Appellants were on inquiry notice of the alleged violations more than six years before the filing date. *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802–03 (1st Cir.1987) (holding that plaintiffs are on notice where there are "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved") (quoting *Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir.1978)). The district court found that Appellants were on "discovery" or "inquiry" notice more than six years prior to August 20, 1993, due to their receipt of the prospectuses and monthly statements Appellees sent them. Thus, it was because the district court found that the documents received by Appellants contained "sufficient storm warnings," which would have alerted them to the possibility of fraud had they acted with reasonable diligence, that it concluded Appellants failed to carry their burden of production regarding the issue of fraud or concealment.

■ In challenging the decision below, Appellants argue that the district court erred in its construction of Section 1113 when it applied the objective standard under the fraudulent concealment doctrine. Specifically, Appellants contend that because Section 1113 involves breaches of fiduciary duty, the term "discover" used in connection with fraud or concealment should mean that the six-year limitation period begins to run only when Appellants, who are unsophisticated investors, subjectively gained knowledge that their fiduciary made material misrepresentations to them. In support of this argument, Appellants point to the plain language of Section 1113 and to the fact that Congress

did not include the phrase "knew or should have known." In addition, they maintain that adopting a subjective standard comports with Congress' mandate that ERISA be liberally construed to protect pension beneficiaries and to ensure the highest standards of fiduciary conduct. *See* 29 U.S.C. § 1001(a), (b). In this regard, they contend that the Congressional mandate is not properly served by requiring that participants heed storm warnings and exercise reasonable diligence where affirmative acts of fraud and concealment are alleged. Finally, Appellants insist that if some standard of reasonable diligence is to be applied, then, at a minimum, traditional factors used in assessing reasonable diligence—the existence of a fiduciary relationship, the nature of the fraud, the opportunity to discover the fraud, the subsequent acts of defendants, and the sophistication of the plaintiffs—should be considered before granting summary judgment. *See Maggio*, 824 F.2d at 128; *Cook*, 573 F.2d at 697.

As always, we begin with the relevant statutory language. Section 1113's tolling provision provides that "in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. As the District of Columbia Circuit recently noted, this is the only provision in Section 1113 for delaying the accrual of the limitations period until the date of discovery. *See Larson*, 21 F.3d at 1172. By its very language, then, Section 1113 explicitly incorporates the federal common law "discovery rule," which postpones the beginning of the limitation period from the date when the plaintiff is injured to the date the injury

is discovered. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990). As we noted when interpreting the statute of limitations contained in Section 13 of the Securities Act of 1933, which is applicable to Section 12(2) of that Act, "the doctrine of fraudulent concealment is the common law counterpart of the 'discovery' standard prescribed by § 13 to limit actions brought under § 12(2)." *Cook*, 573 F.2d at 695; *see Anixter v. Home–Stake Production Co.*, 939 F.2d 1420, 1434 n. 18 (10th Cir.1991) (citing *Cook* for this proposition). We concluded in *Cook* that the running of Section 13 was triggered by the very same considerations used to determine when the cause of action accrues and when the statute is tolled under federal common law. *Cook*, 573 F.2d at 695; *see Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (holding that equitable doctrine of fraudulent concealment is read into every federal statute of limitations). We find that Section 1113's discovery rule is almost identical to that of Section 13[7] and perceive no reason why we should not follow *Cook*'s approach and hold that Section 1113 also incorporates the fraudulent concealment doctrine.[8] Moreover, we have yet to encounter a convincing argument as to why we should part company from those circuits which have already addressed this issue and have concluded that Section 1113 indeed incorporates the fraudulent concealment doctrine. *See Larson*, 21 F.3d at 1172–73; *Martin*, 966 F.2d at 1093; *Schaefer*, 853 F.2d at 1491–92; *see also Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1401–02 (9th Cir.1995) (noting with approval that other circuits have so held).[9]

---

7. Section 13 provides in pertinent part:

 No action shall be maintained to enforce any liability created under Section ... [12(2)] of this title unless brought within one year after the date of discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence....

 15 U.S.C. § 77m (1994).

8. In reaching this decision, we have taken into account the different policies underlying, and protections afforded by, the Securities & Exchange Acts of 1933 and 1934 and ERISA. Absent statutory or other Congressional directive,

we find no reason why our interpretation of the statutes of limitations should not be guided by the same approach.

9. Where courts differ is on how "in the case of fraud or concealment" should be construed, specifically whether it includes both so-called "self-concealing wrongs" as well as "active concealment" that is separate from the underlying wrongdoing. *See generally Martin*, 966 F.2d at 1093–96, 1101–04 (Posner, J., concurring); *Radiology Center*, 919 F.2d 1216, 1220–21 (1990); *see also* footnote 16 *infra*. Resolution of this appeal does not require us to make a definitive determination as to which side of this dialogue

Next, with respect to the scope of "discovery" in the fraud or concealment exception, we believe that the term encompasses both actual and constructive discovery. As the Seventh Circuit noted in *Martin*, Congress knew how to require "actual knowledge," and did so for the three-year limitations period under Section 1113(2). Holding that the fraud or concealment exception extends the limitations period to six years from the date of actual discovery would conflict with the fact that the preceding three-year period runs from the date of "actual knowledge." In addition, incorporating the notion of constructive discovery comports with the general requirement under the fraudulent concealment doctrine that there be a showing of reasonable diligence before tolling is allowed.[10] *Martin*, 966 F.2d at 1096; *Maggio*, 824 F.2d at 127–28; *Kennedy*, 814 F.2d at 802; *Cook*, 573 F.2d at 695.

We turn, lastly, to the appropriate standard to be applied when determining the "date of discovery." As we emphasized in *Maggio*, whether a plaintiff should have discovered the alleged fraud "is an objective question" requiring the court to "determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud." *Maggio*, 824 F.2d at 128 (citing *Cook*, 573 F.2d at 697). We are unpersuaded by Appellants' insistence that by adopting such an objective standard we will undercut ERISA's goals regarding the protection of pension benefits. First, Appellants' argument seems to ignore the plain language of Section 1113 explicitly calling for a "discovery" standard, which has been interpreted to employ a "known or should have known" standard. *See United States v. James Daniel Good Property*, 971 F.2d 1376, 1381 (9th Cir.1992).

Second, while this inquiry is an "objective" question, the determination of whether a plaintiff actually exercised reasonable diligence is a more subjective one. In making that assessment, we "focus[ ] upon the circumstances of a particular case, including the existence of a fiduciary relationship, the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants." *Maggio*, 824 F.2d at 128; *Kennedy*, 814 F.2d at 803 (stating that "the exercise of reasonable diligence is determined 'by examining the nature of the misleading statements alleged, the opportunity to discover the misleading statements, and the subsequent actions of the parties'") (quoting *Cook*, 573 F.2d at 696). We believe that because we engage in a "subjective" inquiry when assessing the exercise of reasonable diligence, ERISA's goals will not be undercut by applying an objective standard when determining the "date of discovery." Whatever apparent harshness that may result from application of the objective standard will be mitigated by our consideration of those more subjective factors.

We also remind Appellants that "[a]lthough any statute of limitations is necessarily arbitrary, the length of the period reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975). Section 1113 explicitly time bars actions against fiduciaries which are not commenced within six years of either the date of the last transaction or, in the case of fraud or concealment, the date of discovery. 29 U.S.C. § 1113. In this regard, we note that Section 1113 states "after the earlier of," not "after the later of," which makes it a more stringent statute of limitations than, for example, ERISA's Sec-

---

we adhere. We merely note for the moment that because the fraudulent concealment doctrine as applied in this Circuit includes both categories, *see, e.g., Kennedy*, 814 F.2d at 802, and the fact that there is nothing in the language of Section 1113 to suggest otherwise, we are inclined to think that the scope of Section 1113's incorporation of the fraudulent concealment doctrine includes both. *See Martin*, 966 F.2d at 1094–95.

10. There is authority that reasonable diligence is not required in cases of active concealment. *See, e.g., Martin*, 966 F.2d at 1096 nn. 19, 20, 1098; *Lewis v. Hermann*, 775 F.Supp. 1137, 1148 (N.D.Ill.1991).

tion 1451(f).[11] The protections Congress established under ERISA are clearly available to plaintiffs who do not let their rights pass them by. Finally, we note further that none of the other circuit courts which have interpreted Section 1113 have adopted a subjective standard despite the fact that those cases, as here, involved alleged breaches of fiduciary duty.[12]

 In summary then, we hold that the fraud or concealment tolling provision of Section 1113 incorporates the fraudulent concealment doctrine, which operates to toll the statute of limitations "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part ... until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.'" *Holmberg*, 327 U.S. at 397, 66 S.Ct. at 585 (quoting *Bailey*, 88 U.S. at 348); *see Maggio*, 824 F.2d at 127. Accordingly, in order to toll the limitations period under Section 1113's fraud or concealment exception, Appellants must demonstrate that "(1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of reasonable diligence." *Larson*, 21 F.3d at 1172 (quoting *Foltz v. U.S. News & World Report, Inc.*, 663 F.Supp. 1494, 1537 (D.C.Cir.1987)).[13] Furthermore, it is Appellants' burden under Federal Rule of Civil Procedure 9(b) to plead with particularity the facts giving rise to the fraudulent concealment claim. Plaintiffs' at-

tempt to toll the statute will fail if the evidence shows that they were on discovery notice of the alleged violations of fiduciary duty more than six years before the filing date. *See Truck Drivers & Helpers Union, Local No. 170 v. NLRB*, 993 F.2d 990, 998 (1st Cir.1993) (noting that the burden of showing reasonable diligence normally falls on the party seeking to toll the statute of limitations by alleging affirmative acts of concealment under the doctrine of fraudulent concealment). This Circuit has characterized the facts that trigger discovery or constructive notice as "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved." *Cook*, 573 F.2d at 697. While discovery does not require that plaintiffs become fully aware of the nature and extent of the fraud, it is these "storm warnings" of the possibility of fraud that trigger their duty to investigate in a reasonably diligent manner, and their cause of action is deemed to accrue on the date when they should have discovered the alleged fraud. *Maggio*, 824 F.2d at 128.

## B. Application of the Fraud or Concealment Exception

Having set forth the applicable standard and relevant considerations, we turn to the application of Section 1113's fraud or concealment exception. In their complaint, Appellants allege that Appellees engaged in a fraudulent trading scheme comprising purchases of unsuitably high risk limited partnerships, account churning, and commission overcharges. Appellants contend that Appellees, in furtherance of their scheme, made

---

**11.** Section 1451(f) provides that, "An action under this section may not be brought after the later of—

(1) 6 years after the date on which the cause of action arose, or

(2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.

29 U.S.C. § 1451(f) (1994). In interpreting this statute, courts have acknowledged that

§ 1451(f)(2), but not § 1451(f)(1), incorporates a discovery rule. *See Larson*, 21 F.3d at 427.

**12.** While the parties did not cite to any legislative history, we have not found much that is particularly helpful regarding Congress' intent with respect to Section 1113. *Accord, Larson*, 21 F.3d at 1171; *Radiology Center*, 919 F.2d at 1221.

**13.** We adopt the formulation most recently reiterated by a member of this Court in *Larson*, which sets forth a clear test and does not differ in substance from our usual description of the fraudulent concealment doctrine. *See, e.g., Maggio*, 824 F.2d at 127 (setting forth *Bailey* standard).

material oral and written misrepresentations regarding the value and safety of the investments, the amount of profit generated by the trades, and the amounts of commissions charged.

For purposes of disposing of this appeal, we need not make any specific findings regarding the issue of whether Appellees committed or concealed the alleged fraud. Nevertheless, we review the record in the light most favorable to Appellants, the non-moving party, as we determine whether the district court erred when it granted summary judgment based on its conclusion that Appellants had not offered evidence from which a reasonable juror could conclude that Appellants would not have known, in the exercise of reasonable diligence, about Appellee's alleged violations six years or more before August 20, 1993, *i.e.,* on or before August 20, 1987. We discuss the transactions in turn.

### 1. *The Limited Partnerships*

### A. *The Alleged Misrepresentations and the Prospectuses*

 With respect to the three limited partnerships purchased in June 1985, September 1985, and June 1987 respectively, Appellants allege that Appellees violated their fiduciary duty by orally misrepresenting the risks and the suitability of the these investments. They contend that the names [14] of the limited partnership interests were deceptive because they suggest safe and suitable pension investments. They also maintain that the portfolio reviews substantiated Hegenbart's misrepresentations so that Appellants were induced to retain the interests. Even assuming that the titles were "deceptive" and that the reviews were misleading, the record shows that Appellants received prospectuses on or about the date each of these interests were purchased. The prospectuses fully disclosed the suitability requirements and risk factors and, when read with reasonable diligence, plainly contradict the alleged oral misrepresentations that these were low-risk investments. Appellants have not alleged that any of the risk disclo-

sures contained in the prospectuses are fraudulent. Even viewing the facts in the light most favorable to the Appellants, we find that these disclosures provided them with sufficient storm warnings of the alleged misrepresentations and the possibility of fraud. *Maggio,* 824 F.2d at 129 (holding that financial data that contradicted what plaintiffs were led to believe provided sufficient storm warnings); *Kennedy,* 814 F.2d at 801 (holding that discrepancy between oral misrepresentations and an offering memorandum constituted inquiry notice commencing limitations period). Thus, we conclude that receipt of the prospectuses put Appellants on discovery notice of the alleged misrepresentations regarding the suitability and riskiness of the partnerships at or around June of 1985, September of 1985 and June of 1987.

Appellants insist, however, that there are "numerous disputed issues of material fact" regarding the limited partnerships which were relevant on summary judgment. We find only one relevant—Appellants' contention that there is a factual dispute as to whether they ever received the prospectuses. Appellants bolster their position by pointing to the fact that Appellees produced a subscription agreement, which indicates receipt of a prospectus, for only one of the three limited partnerships—the first one, purchased in June of 1985. They also rely on the affidavits submitted by Justman and Bladd which deny the genuineness of their signatures on the subscription agreement. Finally, they base the existence of a disputed material fact on Bladd's third affidavit, in which for the first time Bladd suggests that Appellees did not tell him

> to read any prospecti relating to the partnerships. In fact, I am certain that I never received a prospectus from Hegenbart *before* purchasing a limited partnership on behalf of the Plan.

Record Appendix, p. 145 (emphasis in original). Bladd also states that he has "no recollection" of ever receiving a prospectus and

---

14. The names were "Balcor Pension Investors VI," "Commercial Development Fund 85" and "Federal Insured Mortgage Investors II."

that his files do not contain copies of any prospectuses.

■ As the district court found, Appellants' evidence is insufficient to create a disputed issue of fact with respect to whether they received the prospectuses. First, we note that Bladd's third affidavit, dated February 15, 1995, is the first instance in which Appellants dispute the argument that they were on notice by receipt of the prospectuses. What is striking about this is how late in the proceedings this occurred—more than one year after Appellees first raised the argument in their November 30, 1994 memorandum in support of their motion for summary judgment. Appellants did not dispute Appellees' contention that they received prospectuses in either their initial or supplemental filings in opposition to Appellees' motion for summary judgment, nor in Bladd's first affidavit. The first "contradiction" appears in Appellants' supplemental memorandum, dated February 9, 1995, where the affidavits filed by Justman and Bladd merely state that the signatures on the subscription agreement are not their own. Guided by the principle that when reviewing motions for summary judgment, courts should "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required," *Rivera–Cotto v. Rivera,* 38 F.3d 611, 613 (1st Cir.1994) (quoting *Wynne v. Tufts Univ. Sch. of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)), we view with significant skepticism what appears to be a last ditch effort to create a disputed fact where none exists.

■ Second, and more importantly, Bladd's statements on the issue of whether the prospectuses were received are merely conjectural and, thus, not sufficient to sustain a finding that a disputed issue exists. *See Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) ("[T]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve."). Not only does Bladd's third affidavit fail to state that the prospectuses were never provided or re-

ceived, his lack of recollection is insufficient to rebut Appellees' affidavit and the acknowledgment of receipt evidenced by the subscription agreement. As the district court found, we face Appellants' conjecture versus Appellees' direct statement of fact. On this alone, the weight of the evidence tips the scale in favor of Appellees; and, when considered together with Bladd's statement that he did not find any prospectuses after "he searched [his] files carefully," the scale tips further in their direction. Bladd's statement simply does not satisfy Appellants' burden of producing evidence that they did not receive the prospectuses. Absent any evidence that Bladd had either a set procedure for filing documents or that he would file prospectuses if received, their mere absence from his files does not provide a factfinder with any reasoned basis to believe either that because Bladd's files did not yield the prospectuses he did not receive them or that his files would have contained the prospectuses had they been received. Finally, as the district court also noted, Bladd's affidavit only indicates that he is certain that he did not receive any prospectuses *before* the transactions. It does not contain any probative evidence to dispute the fact that Appellants received prospectuses some time on or around the purchase dates.

Thus, we conclude that because Appellants' evidence lacks "substance in the sense that it [does] not limn[ ] differing versions of the truth which a factfinder must resolve," *id.,* the only reasonable inference a factfinder could reasonably draw is that Bladd received the prospectuses for the limited partnerships on or around the time when the transactions were made. This, coupled with the sufficient storm warnings that the prospectuses revealed, leads us to the conclusion that no reasonable basis exists for a reasonable factfinder to find that Appellants were not on discovery notice of the alleged misrepresentations regarding the limited partnerships.

**B.** *The Alleged Concealment and the Monthly Statements*

■ Appellants also allege that Appellees concealed the partnerships' market value by listing them at their purchase price, rather

than at their market value, in the monthly statements. The district court found that the monthly statements Appellants received did not conceal the market value of the limited partnerships, because they listed the "face amount" and included a statement that "the face amount does not necessarily reflect the current market value." The district court concluded that based on these undisputed facts Appellees did not conceal the market value of these investments. We agree. Beginning in January of 1986, Appellants were presented every month with a reminder that the face amount did not reflect the market value. A simple phone call inquiring about the market value would have exposed the value and shed light on the wisdom of these transactions. *Cook,* 573 F.2d at 696–98 (finding that plaintiffs were on inquiry notice by receipt of ominous financial reports contradicting oral assurances); *Caraluzzi v. Prudential Securities, Inc.,* 824 F.Supp. 1206, 1211–13 (N.D.Ill.1993) (finding that legend on monthly statements which disclosed that face value did not equal market value was sufficient to put investors on notice); *Holtzman v. Proctor, Cook & Co.,* 528 F.Supp. 9, 14 (D.Mass.1981) (finding that confirmation slips and monthly statements should have alerted reasonable persons to the possibility of account mismanagement). Thus, even assuming that Appellees "concealed" the value of the limited partnership interests, Appellants were on discovery notice of the alleged concealment as early as January 1986. *Cook,* 573 F.2d at 695 (holding that even where facts are fraudulently withheld a plaintiff cannot be allowed to ignore the economic status of his or her investment).

### 2. *The Bond Swap*

▬ Appellants allege that Appellees misrepresented the value of the 1986 bond swap transaction and that, contrary to the district court's finding, "a simple reading" of the May 1986, statement would not have alerted unsophisticated investors to the possibly fraudulent nature of the transaction. We disagree. It is undisputed that Appellants were provided with monthly statements, which disclosed the transactions Appellants had authorized Hegenbart to make. Simple arithmetic—straightforward addition and subtraction—reveals a discrepancy of more than $68,000 between the debit attributable to the purchase of the new bonds and their market value. This alone should have alerted Appellants to the possibility that fraudulent statements may have been made in connection with the bonds' value. Thus, while Appellants maintain that they only became aware of the losses resulting from the bond swap in January of 1994, we find that they received sufficient storm warnings in May of 1986.

### 3. *The Commissions*

▬ Appellants also allege that Hegenbart misrepresented that Shearson's commission charges would be below the market rate and that they were overcharged commissions with respect to the bond swap transaction. They contend that "the first notice that [they] received of any possible wrongdoing regarding [the] commissions" was during the summer of 1992, when Bladd was informed that there may have been commission overcharges. We are unpersuaded. As with the bond swap, the May 1986 statement provided Appellants with sufficient storm warnings about the possibility of excessive commissions. As the district court found, the discrepancy between the debit and sale prices for the bonds should have alerted Appellants to the possibility of excessive commissions and prior misrepresentations regarding the rate actually charged. These storm warnings were reinforced by the thunderous sirens contained in Ben–Meir's October 17, 1988 letter "urg[ing] ..., *once again,* to request and obtain an accounting of the fees and commissions" (emphasis added). Contrary to Appellants' contention, the fact that Appellees have not contested the allegation of commission overcharging is irrelevant for purposes of determining whether Appellant's claim is barred by the statute of limitations. Nor is it relevant that the monthly statement *could* have broken out the amount of commissions charged, although such a practice would certainly have been more helpful to Appellants. What is relevant, and controlling for purposes of this appeal, is the date of discovery. Here, that date is May 1986,

which is more than six years before the commencement of this action in August 1993.

### 4. *Reasonable Diligence*

 The storm warnings triggered Appellants' duty to exercise reasonable diligence. *Kennedy,* 814 F.2d at 802; *Cook,* 573 F.2d at 696. Appellants contend, however, that the district court erred when it required them to show reasonable diligence. First, Appellants assert that because the alleged violations involved active concealment, as opposed to self-concealing wrongs, there is no requirement that Appellants show reasonable diligence. *See, e.g., Martin,* 966 F.2d at 1096 nn. 19, 20 (noting that courts are divided as to whether the plaintiff must show due diligence in cases of active concealment); *Lewis v. Hermann,* 775 F.Supp. 1137, 1148 (N.D.Ill. 1991) (noting that a plaintiff's due diligence may be excused when a fiduciary with a duty to disclose engages in active concealment). In this Circuit, however, we have held that "[i]rrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to exercise due diligence, and is thus charged with notice of a potential claim." *Truck Drivers & Helpers Union,* 993 F.2d at 998. As we noted earlier, when the party seeking to toll the statute by fraudulent concealment alleges affirmative acts of concealment, the burden of showing reasonable diligence falls on that party. *Id.* Thus, in this Circuit, by alleging affirmative acts of fraudulent concealment Appellants are required to show due diligence. To cover all of the bases, we note that we place the burden of showing reasonable diligence on the defendant when the plaintiff alleges that the statute is tolled by a self-concealing wrong, *id.,* such that defendants " 'have the burden of coming forward with any facts showing that the plaintiff could have discovered . . . the cause of action if he had exercised due diligence.' " *Id.* (quoting *Hobson v. Wilson,* 737 F.2d 1, 35 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985)). Even placing this burden on Appellees, Appellants' complaint will nonetheless be defeated. Appellants were provided with sufficient information which reveals, or at a minimum suggests, the possibility of the alleged violations.

In the alternative, Appellants argue that, even if some standard of reasonable diligence were applied, a district court must take into account the traditional factors used in assessing reasonable diligence before summary judgment is granted. *Maggio,* 824 F.2d at 128; *Cook,* 573 F.2d at 697. While we agree that the traditional and "more subjective" factors are to be considered, we disagree that they should affect the outcome of this appeal. Stressing the subjective nature of the "reasonable diligence" test, Appellants essentially argue that they acted in a reasonably diligent manner in light of their unsophistication as investors and their reliance on Appellees as their fiduciaries.

 We remind Appellants that, although subjective factors are taken into account, "the exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to [their] investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention." *Cook,* 573 F.2d at 698. Even assuming that Appellees owed Appellants a fiduciary duty, an investor "must 'apply his common sense to the facts that are given to him [or her]' in determining whether further investigation is needed." *Id.* (quoting *Cook,* 573 F.2d at 696 n. 24). While we recognize, and are genuinely troubled by, the possibility that the Participants were such unsophisticated investors that they were not in a position to heed the storm warnings, the stark fact remains that "it was [their] conduct, in accepting the fraudulent misrepresentations and omissions as true, that allowed the fraud." *Kennedy,* 814 F.2d at 803. This is what does them in.

As to the opportunity to discover the misleading nature of Hegenbart's representations and the monthly statements, it could not have presented itself more readily. The misleading information was directly refuted by the plain text of the prospectuses and simple arithmetic of the numbers on the monthly statements. Both Hegenbart's representations about the limited partnerships and the prospectuses' risk disclosures could not be true. Logically, one or the other must have been false. Similarly, while the

monthly statements may have presented a misleading "big picture," comparing two numbers (albeit on two different pages) on the May 1986 statement revealed a significant discrepancy in the bond swap figures. A minimal attempt to resolve these contradictions—for example, asking Ben–Meir, Hegenbart or McHugh for an explanation or a more comprehensive accounting—should have uncovered the fraud or, at a minimum, prompted Appellants to abandon (as Ben–Meir strongly recommended in 1988) their apparent "laissez-faire" approach. *Kennedy,* 814 F.2d at 803 (noting that any attempt to resolve contradictions between oral misrepresentations and offering memorandum should have uncovered the fraud or dissuaded plaintiffs from the folly).

Nor can the subsequent actions of the parties help Appellants' case. Instead of making a minimal inquiry or otherwise attempting to resolve the contradictions, Appellants did absolutely nothing. Even assuming that Appellants did not see the first storm warnings, "there were yet more dark clouds on the horizon." *Maggio,* 824 F.2d at 128. We find that Ben–Meir's letter of October 17, 1988, and Justman's 1990–1992 arbitration proceedings (which produced documents regarding the excessive commissions) should have brought Appellants to attention. Even commencing this action in October of 1988, Appellants still had until June of 1991 to bring suit for violations in connection with the first limited partnership interest (purchased in June of 1985) and until September of 1991 for the second (purchased in September of 1985). Even starting after October of 1991, they still had until June of 1993 for the third limited partnership interest (purchased in June of 1987) and, until May of 1992 for the bond swap and the commissions. Appellants would not have been time-barred on any of their actions had they acted in October of 1988 upon the information before them.

▮ In light of the foregoing, we believe that in this situation even unsophisticated investors, such as Appellants here, should have sought to learn more about the nature and content of the Plan's management. We believe that Appellants' pro-

longed failure to investigate the possibility of fraudulent conduct in light of the multiple storm warnings can hardly be characterized as reasonable diligence. Unsophisticated or not, plaintiffs cannot shroud themselves in ignorance or expect that their unsophistication will thoroughly excuse their lack of diligence or failure, here, to even inquire. To allow unsophisticated investors to remain utterly ignorant in the face of multiple warnings would render meaningless the due diligence requirement. Requiring due diligence encourages plaintiffs to take action to bring the alleged fraud to light, grants some sense of repose to defendants, and assures that evidence presented on the claim will be fresh. *Brumbaugh v. Princeton Partners,* 985 F.2d 157, 162 (4th Cir.1993) (stating that merely bringing suit after the scheme has been laid bare does not satisfy the due diligence requirement when there have been prior warnings that something was amiss).

▮ Lastly, Appellants argue that because reasonable diligence is factually based, it should not ordinarily be decided on summary judgment. *Cook,* 573 F.2d at 697. However, "even assuming the question of reasonable diligence is ordinarily to be decided by the trier of fact, where no conflicting inferences can be drawn from the testimony an appeals court may make its own determination." *Id.; see Sleeper v. Kidder, Peabody & Co.,* 480 F.Supp. 1264, 1266 (D.Mass.1979) (noting that although the issue of reasonable diligence is factually based, it may be determined as a matter of law where the underlying facts are admitted or established without dispute), *aff'd mem.,* 627 F.2d 1088 (1st Cir. 1980). Here, the district court properly granted summary judgment because there is nothing on the record to support an inference that Appellants were reasonably diligent.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is *affirmed.*