2016 ND 214

**Stephen LARSON, Plaintiff and Appellant**

v.

**MIDLAND HOSPITAL SUPPLY, INC., Midland Pro Health, Inc., and Rich-**

ard Larson, individually, Defendants
and Appellees

No. 20160059

Supreme Court of North Dakota.

Filed 11/18/2016

366

Ronald H. McLean (argued) and Ian McLean (appeared), P.O. Box 6017, Fargo, N.D. 58108–6017, for plaintiff and appellant.

C. Nicholas Vogel, P.O. Box 1389, Fargo, N.D. 58107–1389, for defendants and appellees.

Crothers, Justice.

[¶ 1] Stephen Larson appeals from a judgment entered after a bench trial dismissing his complaint against Midland Hospital Supply, Inc. ("Midland"), Midland ProHealth, Inc. ("ProHealth") and Richard Larson. We affirm, concluding the statute of limitations bars Stephen Larson's claims

related to his ownership interest in Midland and the district court did not err finding he was paid for his interest in Midland.

I

[¶ 2] Midland was a North Dakota corporation engaged in the wholesale, resale distribution and sale of medical supplies until dissolved in 2007. The Larson family owned all of the shares of the corporation at all times relevant to the issues on appeal. Richard Larson was the majority shareholder and the president of the company and his brother, Stephen Larson, and their two sisters were minority shareholders. The company had a buy-sell agreement requiring any shareholder desiring to sell, transfer or encumber their shares to first offer them to the other shareholders on a pro-rata basis. If the shareholders did not purchase the offered shares, the company could redeem them. If the company or shareholders did not purchase the shares, they could be sold to any party.

[¶ 3] In April 1999 Richard Larson sent the minority shareholders a letter stating it was a good time for the minority shareholders to sell their shares. He explained that profits were down, dividends would not be paid at the same levels as in the past, the company might need to make decisions about the business that could impact the minority shareholders and they would be best served by selling their shares. In May 1999 Richard Larson sent the minority shareholders a second letter indicating the company wanted to purchase their shares by July 1999. The two sisters agreed to sell their shares. Stephen Larson declined the offer. Richard Larson personally purchased the sisters' shares, increasing his ownership interest in the company.

[¶ 4] Richard Larson obtained a loan from Midland for approximately $500,000 to purchase the shares. The loan was payable over a ten-year period with interest at 7.5 percent. Around the same time Midland borrowed over $500,000 from a bank, payable over the same time period and for the same interest rate.

[¶ 5] In 1994 Richard Larson set up ProHealth, a retail company selling medical supplies. Richard Larson was the president and sole shareholder. ProHealth purchased approximately half of its inventory from Midland. It had an outstanding accounts receivable with Midland by 2001. By the end of 2006 ProHealth owed Midland approximately $1,600,000. In August 2007, the full amount of the accounts receivable was paid. Interest on the receivable was paid in August 2008.

[¶ 6] In July 2007 Midland sold its building, inventory and additional assets to Kreisers, Inc. Kreisers also agreed to pay approximately $500,000 for goodwill and a covenant not to compete. Kreisers did not acquire Midland's accounts receivable, accounts payable or other long-term loans. Midland liquidated its remaining assets and paid off its long-term loans and its accounts payable. The remaining funds were distributed to the shareholders. At the time of the dissolution Stephen Larson owned 11.046512 percent of the company's stock, and Richard Larson owned 88.953488 percent of the stock. Stephen Larson received $493,631.38 from the distribution and an additional $42,323.49 for his share of the interest on the ProHealth accounts receivable.

[¶ 7] Stephen Larson sued for breach of fiduciary duty, conflict of interest, negligence, breach of shareholder buy-sell agreement, misappropriation, conspiracy, conversion, action for accounting and unjust enrichment. The summons and complaint were served in June 2013, and the action was filed in September 2014. Stephen Larson alleged Richard Larson

breached his fiduciary duties as a corporate director and officer by diverting, misusing and misappropriating Midland's funds, engaging in self-dealing and violating the buy-sell agreement. Stephen Larson claimed he would have owned 16.6 percent of Midland stock if the company redeemed the sisters' shares as Richard Larson had informed the minority shareholders, he was not informed Richard Larson personally purchased the shares and he was not informed Midland loaned Richard Larson funds to purchase the shares. He also claimed he was not offered a loan to purchase the shares, he was not offered the opportunity to purchase the shares and Richard Larson did not comply with the buy-sell agreement. Stephen Larson claimed the Midland defendants committed wrongful acts between 1996 and 2007 which deteriorated the value of Midland by allowing ProHealth to purchase inventory at a discount without promptly paying for the inventory or paying interest on the outstanding amounts. Stephen Larson further claimed Richard Larson received an excessive salary when dividing his time between the two companies.

[¶ 8] After a bench trial the district court dismissed Stephen Larson's complaint with prejudice and awarded the Midland defendants costs and disbursements. The court found Stephen Larson's claims of alleged breaches of the buy-sell agreement and various breaches of fiduciary duties were barred by the statute of limitations. The court also found Stephen Larson was fully compensated for any damages from the buildup in accounts receivable, he failed to prove he did not receive the correct amount of proceeds from the dissolution of the company, he failed to prove the discounted inventory sales to ProHealth were unreasonable and he failed to prove Richard Larson's salary was excessive. A judgment was entered.

## II

[¶ 9] The standard of review on appeal from a bench trial is well-established:

"In an appeal from a bench trial, the trial court's findings of fact are reviewed under the clearly erroneous standard of N.D.R.Civ.P. 52(a) and its conclusions of law are fully reviewable. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made. In a bench trial, the trial court is the determiner of credibility issues and we do not second-guess the trial court on its credibility determinations."

Serv. Oil, Inc. v. Gjestvang, 2015 ND 77, ¶ 12, 861 N.W.2d 490 (quoting Brash v. Gulleson, 2013 ND 156, ¶ 7, 835 N.W.2d 798) (internal citations and quotation marks omitted). "A district court's choice between two permissible views of the weight of the evidence is not clearly erroneous." Cheetah Props. 1, LLC v. Panther Pressure Testers, Inc., 2016 ND 102, ¶ 9, 879 N.W.2d 423 (quoting Nelson v. Johnson, 2010 ND 23, ¶ 31, 778 N.W.2d 773).

## III

[¶ 10] Stephen Larson argues the district court erred in determining the statute of limitations barred his claims for breach of the buy-sell agreement and fiduciary duties.

## A

[¶ 11] The parties agree a six-year statute of limitations applies to Stephen Larson's claims under N.D.C.C. § 28–01–16. Generally, the statute of limitations begins to run from the commission of the wrongful act giving rise to the cause

of action; however, that rule is subject to a discovery rule. <u>Wells v. First Am. Bank W.</u>, 1999 ND 170, ¶ 9, 598 N.W.2d 834.

> "The discovery rule postpones a claim's accrual until the plaintiff knew, or with the exercise of reasonable diligence should have known, of the wrongful act and its resulting injury.... We have used an objective standard for the knowledge requirement under the discovery rule. The focus is upon whether the plaintiff is aware of facts that would place a reasonable person on notice a potential claim exists, without regard to the plaintiff's subjective beliefs."

<u>Id.</u> at ¶ 10 (citations omitted). "[N]otice of facts, which would put a person of ordinary intelligence on inquiry, is equivalent to knowledge of all of the facts a reasonable diligent inquiry would disclose." <u>Jones v. Barnett</u>, 2000 ND 207, ¶ 8, 619 N.W.2d 490. "[A]fter acquiring knowledge of the facts, a party has a responsibility to promptly find out what legal rights result from those facts, and failure to do so will be construed against the party." <u>Id.</u> "The determination of when a plaintiff's cause of action has accrued is generally a question of fact, but if there is no dispute about the relevant facts, the determination is for the court." <u>Dunford v. Tryhus</u>, 2009 ND 212, ¶ 6, 776 N.W.2d 539 (quoting <u>Tarnavsky v. McKenzie Cty. Grazing Ass'n</u>, 2003 ND 117, ¶ 9, 665 N.W.2d 18).

[¶ 12] The district court applied the discovery rule and concluded Stephen Larson's claims were barred by the statute of limitations. The court found Stephen Larson understood at the time of the sale of the sisters' shares that his ownership interest in Midland would increase from 11 percent to 16.6 percent if the company redeemed the shares. The court found Stephen Larson received annual financial statements and K–1s from Midland and he received the 1999 financial statement and K–1 in the spring of 2000. The court found the 1999 financial statement showed the sisters were no longer shareholders and Richard Larson's shares had increased by the amount of shares he purchased from the sisters. The statement also showed Stephen Larson's shares did not change and the K–1 showed Stephen Larson's percentage of ownership interest had not increased from 11 percent to 16.6 percent as he expected it would if Midland redeemed the sisters' shares. The court found Stephen Larson should have known by the spring of 2000 that Midland did not redeem the sisters' shares because the financial statement and K–1 provided notice, and he had a responsibility at that point to discover what legal rights he might have. The court found Stephen Larson's cause of action for any claims that his ownership interest should have been 16.6 percent instead of 11 percent accrued in the spring of 2000, and therefore the claims were barred by the statute of limitations.

[¶ 13] Stephen Larson argues the discovery rule applies and the statute of limitations was tolled until after the sale of Midland in August 2007. He claims the court failed to consider a fiduciary relationship existed, Richard Larson told him the company was going to redeem the sisters' shares, he trusted the president of the company was telling the truth when he said the company was redeeming the shares and Richard Larson never informed the minority shareholders he was going to personally purchase the sisters' shares. He also contends he reviewed the financial statements and believed Midland redeemed the sisters' shares, he continued to own the same amount of shares and a reasonable person with his experience would not have discovered from the financial records that Richard Larson had purchased the shares.

[¶ 14] Stephen Larson argues the court must consider whether the parties have a fiduciary relationship when deciding whether the plaintiff was aware of facts that would place a reasonable person on notice a potential claim exists. Other courts have said the same degree of diligence may not be required when a fiduciary relationship exists; however, they also have held reasonable diligence still is required and the statute of limitations begins to run when the plaintiff has notice of facts that would put a reasonable person on inquiry. See, e.g., Schmidt v. Skolas, 770 F.3d 241, 253 (3d Cir.2014) (stating the concept of reasonable diligence is more deferential to the plaintiffs when a fiduciary relationship exists); Graham–Sult v. Clainos, 756 F.3d 724, 743 (9th Cir.2013) (stating the same degree of diligence is not required when a fiduciary relationship exists, but plaintiffs continue to have a duty to investigate when they have notice of facts sufficient to arouse a reasonable person's suspicions); Hope v. Klabal, 457 F.3d 784, 791 (8th Cir.2006) (stating a delay in discovering wrongdoing may be excusable if a fiduciary relationship exists); Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 711–12 (2d Cir.2002) (stating the plaintiff's burden of discovery is reduced when a fiduciary relationship exists, but the statute of limitations begins when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry); J. Geils Band Emp. Ben. Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1259 (1st Cir.1996) (holding plaintiffs were required to investigate after receiving multiple "storm warnings" to exercise reasonable diligence, even if a fiduciary relationship existed).

[¶ 15] In J. Geils Band, 76 F.3d at 1248, the court affirmed a district court's summary judgment dismissing the claims of the trustee and participants of a pension and profit sharing plan against brokers for breach of fiduciary duty and fraud because the claims were barred by the statute of limitations. The court held the receipt of the prospectuses for three limited partnerships the brokers invested in for the plan put the participants and trustee on discovery notice of alleged oral misrepresentations related to the suitability and risk of the investments because the prospectuses fully disclosed suitability requirements and risk factors and plainly contradicted the alleged oral misrepresentations. Id. at 1256. The trustee and participants argued they acted in a reasonably diligent manner in light of their unsophistication as investors and their reliance on the appellees as their fiduciaries. Id. at 1259. The court held subjective factors may be taken into account in determining if reasonable diligence was exercised, but even if a fiduciary relationship existed the trustee and participants were required to apply common sense to the facts given to them in determining whether further investigation was needed. Id. The court said the trustee and participants had an opportunity to discover the misleading nature of the brokers' oral statements because the misleading information was refuted by the plain text of the prospectuses and simple arithmetic of the numbers on the monthly statements. Id. The court noted the appellants did not even make a minimal inquiry or attempt to resolve the contradictions, and stated:

"Unsophisticated or not, plaintiffs cannot shroud themselves in ignorance or expect that their unsophistication will thoroughly excuse their lack of diligence or failure, here, to even inquire. To allow unsophisticated investors to remain utterly ignorant in the face of multiple warnings would render meaningless the due diligence requirement. Requiring due diligence encourages plaintiffs to take action to bring the alleged fraud to light, grants some sense of repose to

defendants, and assures that evidence presented on the claim will be fresh." Id. at 1260.

[¶ 16] Here, evidence established Richard Larson informed the minority shareholders in April and May 1999 that the company wanted to purchase their shares of Midland stock, Stephen Larson refused the company's offer and Richard Larson personally purchased the sisters' stock. Stephen Larson testified that he understood in 1999 that his percentage of stock ownership would increase from 11 percent to 16.6 percent if the company purchased the sisters' shares. Evidence established Stephen Larson received annual financial statements from Midland, including a list of the company's stockholders and the number of shares each stockholder held. Stephen Larson received a K-1 tax document annually, explicitly stating the shareholder's percentage of stock ownership. The 1998 financial statement showed Richard Larson owned 334.5 shares, Stephen Larson owned 66.5 shares and the two sisters each owned 100.5 shares. The 1999 financial statement showed Richard Larson owned 535.5 shares, Stephen Larson owned 66.5 shares and the sisters no longer were listed as shareholders. The K-1s for 2000 and all subsequent years stated Stephen Larson's percentage of stock ownership was 11.046512. Stephen Larson admitted he could have used these documents to determine that Richard Larson's shares increased by 201 shares and that his ownership percentage did not increase to 16.6 percent. The evidence supports the district court's findings.

[¶ 17] Stephen Larson claims the statute of limitations should be tolled because a fiduciary relationship existed and he trusted his brother. However, Stephen Larson sent Richard Larson a letter dated July 16, 2003 expressing disappointment with the way Richard Larson was running the

company and stating, "Certain requirements of the [buy]-sell have been abrogated, fiduciary protection of shares has been ignored, and the method of share repurchase and other factors as they affect distributions present a far different attitude than those that Dad had planned for all of us in his charter." The letter further stated, "Because of my uneasiness about the direction of Midland, I must choose from alternatives. One would be to challenge your direction and past decisions, the other would be to sell my shares and be done with corporate leadership with which I disagree." Evidence establishes Stephen Larson was suspicious of, or disapproved of, Richard Larson's actions and had information refuting Richard Larson's prior statements. But he did not make timely inquiry into the sale of the sisters' shares.

[¶ 18] Stephen Larson had information by spring 2000 showing Richard Larson purchased the sisters' shares and his ownership interest did not increase to 16.6 percent. The information contradicted Richard Larson's communications that the company would redeem the minority shareholders' shares. Receipt of the 1999 financial statement and K-1 would have put a reasonable person on inquiry and exercising reasonable diligence would have led to the discovery of a potential claim. Under the facts and circumstances of this case, Stephen Larson's actions cannot be characterized as reasonable diligence. The evidence supports the district court's finding that Stephen Larson's cause of action accrued in spring 2000.

**B**

[¶ 19] Stephen Larson argues the Midland defendants are equitably estopped from asserting the statute of limitations bars his claims for 16.6 percent ownership. He contends Richard Larson had a duty,

as an officer, director and majority shareholder, to disclose the information about the sale of the sisters' stock.

[¶ 20] Equitable estoppel may preclude application of the statute of limitations as a defense by the alleged wrongdoer. See Hoffner v. Johnson, 2003 ND 79, ¶ 26, 660 N.W.2d 909; Snortland v. State, 2000 ND 162, ¶ 15, 615 N.W.2d 574. To establish equitable estoppel the plaintiff must show, on the part of the defendant:

> "(1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than those which the defendant subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or will influence, the plaintiff; and (3) knowledge, actual or constructive, of the real facts."

Hayden v. Medcenter One, Inc., 2013 ND 46, ¶ 26, 828 N.W.2d 775. A person claiming estoppel must also prove, on his own part:

> "(1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the [defendant]; and (3) action or inaction based thereon, of such a character as to change the position or status of the [plaintiff], to his injury, detriment, or prejudice."

In re Estate of Helling, 510 N.W.2d 595, 597 (N.D.1994) (quoting Farmers Co-op. Ass'n of Churchs Ferry v. Cole, 239 N.W.2d 808, 813 (N.D.1976)).

[¶ 21] Although the district court did not explicitly address Stephen Larson's equitable estoppel argument, the court found Stephen Larson should have known by spring 2000 that Midland had not redeemed the sisters' shares because information in the financial statement was sufficient to give a reasonable person notice that Richard Larson purchased the sisters' shares. The evidence supports these findings. Evidence established Stephen Larson had information from which he could acquire knowledge of the truth. He did not establish that he lacked knowledge and the means of knowledge of the truth of the facts in question. Stephen Larson failed to establish his claim of equitable estoppel precludes application of the statute of limitations.

### C

[¶ 22] The district court's finding that Stephen Larson's cause of action for any claims related to his ownership interest accrued in spring 2000 is not clearly erroneous. Stephen Larson had six years to bring an action related to these claims. The district court did not err in finding Stephen Larson's claims were barred by the statute of limitations.

### IV

[¶ 23] Stephen Larson argues the district court erred in finding the Midland defendants did not breach their fiduciary duties by selling inventory to ProHealth at a five percent markup. He claims ProHealth was not one of Midland's best customers, Midland's average markup was twenty to twenty-six percent and the accounts receivable for ProHealth was over $1,850,000 when Midland began selling its assets in 2007. He contends nothing supports the court's finding that Pro Health was entitled to a markup lower than every other Midland customer.

[¶ 24] The district court found Pro-Health purchased about half of its inventory from Midland, it was able to pay for most of the inventory for the first seven years of operation, but by 2001 it had an outstanding receivable and by 2007 it had

an outstanding receivable of almost $1,750,000. The court found Richard Larson personally guaranteed full payment of the receivable, he paid the full amount after the Midland assets were sold to Kreisers and Stephen Larson received his share of the payment. The court also found:

"Midland's markup on its inventory sales to ProHealth was five percent. A five percent markup is lower than the seven to eight percent markup that Midland typically charged its larger customers. On sales to customers other than ProHealth, however, Midland's gross profits on each sale were reduced by the 20 to 30 percent commission that was paid to the salesperson responsible for the sale and by a freight charge of up to one percent on each sale. Since there were no commission costs and no freight costs in connection with the sales to ProHealth, the five percent markup was not unreasonable."

[¶ 25] Richard Larson testified that Midland's better customers purchased goods for cost plus seven percent. He testified Midland paid the freight on these sales, which was two or two and a half percent for shipping outside of town and Midland paid commission. He testified Midland made between four and five percent on these sales. Richard Larson testified ProHealth received a markup of five percent, but Midland did not pay commission, freight or other expenses on those sales. Richard Larson testified the lower markup for ProHealth also was because it was a very flexible customer, purchasing products Midland normally stocked instead of requiring Midland to stock specialty products. ProHealth entered its orders directly into the system, bypassing customer service people and accepted brand substitutions unlike other big customers. Although conflicting evidence existed about what percentage of markup was reasonable, this

Court does not make credibility determinations. See Serv. Oil, 2015 ND 77, ¶ 12, 861 N.W.2d 490. The district court's findings are presumptively correct. Id. Evidence supports the court's findings and, based on the entire record, we are not convinced a mistake has been made. The court's findings are not clearly erroneous.

## V

[¶ 26] Stephen Larson argues the district court erred in not finding Richard Larson's salary from Midland was excessive. He claims Richard Larson received a salary of $1,911,050 in total from Midland between 1997 and 2006, he received a salary of $48,900 from ProHealth over the same period and he spent at least 25 percent of his time working for ProHealth. He contends Midland was paying Richard Larson to operate both companies.

[¶ 27] The district court found Richard Larson's salary from Midland was not excessive, explaining:

"During the period between 1997 and 2006, Richard received an average salary of approximately $191,000 per year. Normally, a chief executive running a business whose sales exceeded $13,000,000 per year would have received a salary in excess of $270,000. . . . Although during normal working hours, Richard did spend some time dealing with ProHealth affairs, the time spent during his regular 40 hour work week on such matters was limited to 2 or 3 hours per week. His involvement with ProHealth did not involve a substantial amount of his time because the company was being run by experienced personnel."

"The statement in several of the ProHealth income tax returns that Richard spent 25% of his time on ProHealth business does not establish that Richard

reduced the time he spent on Midland business matters by 25%, nor support the assertion that Richard's salary for running Midland should be reduced by 25%."

[¶ 28] Evidence established Richard Larson indicated on his tax returns that he spent 25 percent of his time working for ProHealth, but he testified he spent very little time working on ProHealth business because a manager with experience in a similar business was taking care of operations. He testified that he did not spend 25 percent of his time on ProHealth, that he did not know where the number came from and that he estimated spending five percent of his time on ProHealth. A former Midland employee testified Richard Larson spent two or three hours per week on ProHealth business while he was in the office. Evidence established Richard Larson's Midland salary was $176,500 to $215,000 per year between 1998 and 2006. Leonard Silwoski, Stephen Larson's expert witness, testified the median annual salary for a chief executive officer in a similar company in the industry was $263,887 in 2007. Silwoski also testified Richard Larson's salary was not excessive if he spent at least 85 percent of his time working for Midland. A report from Chad Flanagan, an expert for the Midland defendants, stated market compensation for a comparable position, industry, revenue and location was approximately $217,000 annually during 2007. Flanagan testified the amount of time Richard Larson spent working for ProHealth made Richard Larson's salary from Midland reasonable. Evidence supports the court's findings and we are not convinced, based on the entire record, that a mistake has been made. The district court's finding that Richard Larson's Midland salary was not excessive is not clearly erroneous.

VI

[¶ 29] Stephen Larson argues the district court erred in finding that he received full compensation for the sale of Midland and its assets and that he was fully compensated for damages from the ProHealth accounts receivable.

[¶ 30] The district court found Kreisers purchased some of Midland's assets in 2007 and agreed to pay approximately $500,000 for goodwill and a covenant not to compete. Midland liquidated the remaining assets and paid off the long term loans and the accounts payable. The court found the remaining funds were distributed to the two shareholders and Stephen Larson received 11.046512 percent of the funds. The court found ProHealth had an outstanding receivable of approximately $1,750,000 at the time of the sale to Kreisers. Richard Larson paid the full amount of the receivable and had an accounting firm calculate interest on the receivable. The accounting firm determined the interest on the Pro-Health receivable, at a variable rate, was $383,139.35, and Stephen Larson was paid his share of the interest on the ProHealth receivable. The court found "There was no evidence at trial that Steve did not receive 11.046512% of the funds available for payment to the shareholders after the other Midland assets had been liquidated."

[¶ 31] Richard Larson testified Midland used money from the sale of its assets to Kreisers to pay off loans and trade accounts, the remaining funds were distributed to the shareholders and Stephen Larson received a check for approximately $200,000. He testified he used his portion of the distribution to pay off the ProHealth accounts receivable and Stephen Larson was paid his share of the funds from the receivable. He testified Midland collected the rest of the accounts receivable and Stephen Larson was paid a portion of those funds. He testified that he instructed

his accountants to calculate the amount of interest for the ProHealth receivable so he could compensate the shareholders. Evidence established the accountants determined ProHealth owed $383,139.35 for interest and Stephen Larson was paid for his share of the interest. The record included Midland checks to Stephen Larson and Richard Larson, showing Stephen Larson received approximately 11 percent of the distributed funds and 11 percent of the interest on the ProHealth receivable. The evidence supports the court's findings, and we conclude the findings are not clearly erroneous.

## VII

[¶ 32] We affirm, concluding the statute of limitations bars Stephen Larson's claims related to his ownership interest in Midland and the district court did not err finding he was paid for his interest in Midland.

[¶ 33] Daniel J. Crothers

Lisa Fair McEvers

Dale V. Sandstrom

Bradley A. Cruff, D.J.

Gerald W. VandeWalle, C.J.

[¶ 34] The Honorable Bradley A. Cruff, D.J., sitting in place of Kapsner, J., disqualified.